UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EPIC TECH, LLC,                )
                                )
     Plaintiff/Counterclaim Defendant,   )
                                )     CASE NO. 1:20-cv-02428-MHC
     v.                          )
                                )
PEN-TECH ASSOCIATES, INC.,     )
                                )
     Defendant/Counterclaim Plaintiff.   )
_____)

## PEN-TECH ASSOCIATES, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF FOR
## U.S. PATENT NO. 8,545,317

FISHERBROYLES, LLP

RICHARD LEHRER
(admitted *pro hac vice*)
richard.lehrer@fisherbroyles.com
109 Normandy Drive
Woodstock, GA 30188
Tel: 845-519-9525

VINCENT BUSHNELL
Georgia Bar No. 098999
vincent.bushnell@fisherbroyles.com
945 East Paces Ferry Rd. NE
Suite 2000
Atlanta, Georgia 30326
Tel: 678-902-7190

*Attorneys for Defendant/Counterclaim Plaintiff Pen-Tech Associates, Inc.*

**CONTENTS**

I. INTRODUCTION ...............................................................................1

II. THE '317 PATENT ...........................................................................2

III. LEGAL STANDARD .........................................................................3

IV. CLAIM TERM ANALYSIS .................................................................6

   A. Play – (Claims 1 and 18) – Indefinite. .........................................6

   B. Play a Game – (Claims 1 and 18) – Indefinite. ...........................10

   C. Play of a Game/Play of the Second Game (Claims 1 and 18) – Indefinite.11

   D. Bonus Time Period – (Claims 1 and 18) – Indefinite. ................13

   E. Occurs/Occurred – (Claims 1 and 18) - Takes place/took place.................16

   F. Particular Point in Time – (Claims 1 and 18) – Indefinite.........................18

   G. Coincident With – (Claim 1) - Sharing a common time with....................19

   H. The First Game – (Claim 1) – Indefinite.....................................................20

   I. Playing the First Game (Claim 1) – Indefinite............................................21

   J. Triggered to Play – (Claim 1) – Set to Begin..............................................22

   K. Without Input from the Player (Claim 1) – Indefinite. ..............................23

   L. Receiving Requests from a Plurality of Players to Play a Game................24

M.   At Least One Processor (Claim 18) - One or more processors working together...................................................................................................25

**V.   CONCLUSION** ..............................................................................**25**

# TABLE OF AUHORITIES

**Cases**

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, n.3, 1333 (Fed.

Cir. 2006) ..............................................................................................................4

*Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d, 1324, 1329 (Fed. Cir. 2012) .........3

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317

(Fed. Cir. 2000) ....................................................................................................4

*Epic Tech, LLC v. Fusion Skill, Inc.*, 534 F. Supp. 3d 741, 741 (S.D. Tex. 2021) ...2

*Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir.

1990) ....................................................................................................................4

*HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1276 (Fed. Cir. 2012)............6

*Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ..........6

*Liebel-Flarsheim Co. v. Medrad*, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004) ............4

*Marine Polymer Techs. v. HemCon, Inc.*, 672 F.3d 1350, 1367 (Fed. Cir. 2012) ....5

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)...........5

*Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366, 1371

(Fed. Cir. 2015)............................................................................................ passim

*Microstrategy Inc. v. Bus. Objects Ams.*, 238 Fed. Appx. 605, 609 (Fed. Cir. 2007)

................................................................................................................................4

iii

*Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, n.8, 911 (2014)..................6

*Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995) .........3

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005)................... 3, 4, 5

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) .................4

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1379 (Fed Cir. 2019) ....................................................................................................................4

*Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, No. 2011-1397, 2012 U.S. App. LEXIS 5985, at *13 (Fed. Cir. March 22, 2012) .........................................5

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).............................................................................................5

*Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)...................3

## Statutes

35 U.S.C. §101 ...........................................................................................................2

## Other Authorities

Oxford Dictionaries............................................................................................6, 16

Pursuant to Patent L.R. 6.5(a) and the Court's December 9, 2021, Order Granting [40] Motion to Extend Claim Construction Deadlines [Doc. 41] (the "Order"), Defendant/Counterclaim Plaintiff Pen-Tech Associates, Inc. ("Pen-Tech"), respectfully submits this opening claim construction brief with regard to those terms for U.S. Patent No. 8,545,317 (the "'317 Patent") that the Parties have identified as requiring construction, and shows the Court as follows:

## I.    INTRODUCTION

According to the Court's June 25, 2021, Scheduling Order [Doc. 31], "[t]he Joint Preliminary Report and Discovery Plan is deemed to be filed and effective as of August 2, 2021 and all discovery deadlines and local patent rule deadlines shall run from that date."  In accordance with Patent L.R. 6.1, on October 29, 2021, Pen-Tech served a list of claim terms, phrases, or clauses which Pen-Tech contends should be construed by the Court.  Plaintiff/Counterclaim Defendant Epic Tech, LLC ("Epic Tech") served no such list.  In accordance with Patent L.R. 6.2, on November 18, 2021, Pen-Tech served preliminary proposed constructions of each identified claim term, phrase, or clause.  Epic Tech again served no such preliminary proposed constructions.

1

## II.    THE '317 PATENT

The '317 Patent (a true and correct copy of which is attached as Exhibit 1 hereto), issued from U.S. Patent Application No. 13/617,105 (the "'105 Application") which was filed on September 14, 2012, and which claims on the face of the patent, *inter alia*, to be a continuation-in-part of U.S. Patent Application No. 13/424,630 (the "'630 Application").  U.S. Patent Application Nos. 14/012,113, 14, 624,337, 15, 292,360, 16/287,877 and 17/179,347 (collectively the "Children Applications") all claim priority to the '317 Patent.  Notably the Children Applications and the '630 Application which issued into U.S. Patent No. 8,545,315 have all either been abandoned or otherwise invalidated based on 35 U.S.C. §101 for being directed to non-patentable subject matter.  (*See* U.S. Patent and Trademark Office ("USPTO") Public Patent Application Information Retrieval ("PAIR") Continuity Data for the '317 Patent (a true and correct copy of which is attached as Exhibit 2 hereto) and *Epic Tech, LLC v. Fusion Skill, Inc.*, 534 F. Supp. 3d 741, 741 (S.D. Tex. 2021).  The claims of the '317 Patent are indefinite for the reasons discussed below and also are invalid under 35 U.S.C. §101 as directed to non-patentable subject matter.

During the prosecution of the '105 Application, the patentee on two separate occasions amended issued claim 1 to overcome prior art, first to include the

2

indefinite term "...**the** first game" (emphasis added) for which there is no

antecedent basis and then to add another indefinite term "wherein once the second

game is triggered to play, a server conducts all play of the second game **without**

**input from the player** until play of the second game is terminated" (emphasis

added) for which there is no support in the specification.  At the time, Epic Tech

provided no explanation for either of these amendments.

## III.   LEGAL STANDARD

The Federal Circuit repeatedly has held that the "words of a claim 'are

generally given their ordinary and customary meaning,'" and "the ordinary and

customary meaning of a claim term is the meaning that the term would have to a

person of ordinary skill in the art in question at the time of the invention." *Phillips*

*v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *see also Aventis Pharma*

*S.A. v. Hospira, Inc.*, 675 F.3d, 1324, 1329 (Fed. Cir. 2012).

Intrinsic Evidence. Intrinsic evidence (*i.e.*, the claims, specification and the

prosecution history) is the most significant source of the meaning of disputed claim

language.  *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In fact, the intrinsic evidence alone will often resolve any ambiguity, thereby

rendering it improper to rely on extrinsic evidence.  *Id.* at 1583 (*quoting Pall Corp.*

*v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995)).

<u>Claim Language.</u>  The starting point for any claim construction analysis is the language of the claims themselves, for this language "define[s] the invention to which the patentee is entitled the right to exclude." *Phillips,* 415 F.3d. at 1312; *see also Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990).  "Under the doctrine of claim differentiation, it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims." *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1379 (Fed Cir. 2019).  The presumption is strongest where construction of a disputed claim term attempts to limit an independent claim to language that already appears in a dependent claim.  *Liebel-Flarsheim Co. v. Medrad*, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004).  Additionally, "different claim terms are presumed to have different meanings." *Microstrategy Inc. v. Bus. Objects Ams.*, 238 Fed. Appx. 605, 609 (Fed. Cir. 2007) (*quoting CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, n.3, 1333 (Fed. Cir. 2006).  In contrast, "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

4

The Patent Specification. Claims do not stand alone — they are part of "'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims." *Phillips.* at 1315 (*quoting Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)). The specification is always highly relevant and usually dispositive; indeed, it "is the single best guide to the meaning of a disputed term." *Marine Polymer Techs. v. HemCon, Inc.*, 672 F.3d 1350, 1367 (Fed. Cir. 2012) (*quoting Phillips*, 415 F.3d at 1315).  However, it is "one of the cardinal sins of patent law" to read a limitation from the specification into the claims. *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys. Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).

The Prosecution History. The prosecution history consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and includes the prior art cited during the examination of the patent. *Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, No. 2011-1397, 2012 U.S. App. LEXIS 5985, at *13 (Fed. Cir. March 22, 2012).  It also "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Moreover, it can inform the meaning of the claim language by demonstrating if the inventor limited the invention during prosecution by making the claim scope narrower than it otherwise would be. *Id.*  Nevertheless, while the prosecution

history can offer insight into the meaning of a claim term, the claim language and the specification generally carry greater weight. *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1276 (Fed. Cir. 2012).

Indefiniteness.  If a term construed in view of the claims and specification "might mean several different things and no informed and confident choice is available among the contending definitions," it is indefinite. *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (*quoting Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, n.8, 911 (2014)); *see also Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## IV.   CLAIM TERM ANALYSIS

### A. Play – (Claims 1 and 18) – Indefinite.

As an initial matter, the word "play" as defined in the Oxford Dictionaries (a true and correct copy of which is attached as Exhibit 3 hereto) can be a verb "engage in activity…" or a noun "activity engaged in…" In the claims, "play" is used as both a verb (*e.g.,* claim 1: "receiving a request…to play a game at a terminal;" claim 18: "receive a request…to play a game on one of the…terminals") and a noun (*e.g*., claim 1: "facilitating play of the game at the terminal;" claim 18: "facilitate play of the game on the one of the…terminals").  This inconsistent use

6

alone is sufficient to render the term "play" indefinite (Declaration of Stacy

Friedman dated February 18, 2022 at ¶¶ 53-61("Friedman Dec.") (a true and

correct copy of which is attached as Exhibit 4 hereto)

Additionally, this term "play" appears multiple times and is used inconsistently

throughout both independent claims of the '317 Patent (1, 18).  In claim 1, the term

appears 10 times as follows:

> A computer-implemented method of allowing a user to **play an electronic game on a terminal**, said method comprising:
> a. receiving a request from a player to **play a game at a terminal**;
> b. at least partially in response to receiving the request, facilitating **play of the game at the terminal**;
> c. at least partially in response to receiving the request from the player, establishing a bonus time period for the player;
> d. receiving an indication that **play of a second game occurs at a particular point in time**;
> e. determining if the bonus time period runs coincident with the particular point in time;
> f. determining, while the player is **playing the first game**, whether **play of the second game results in a prize**; and
> g. if **play of the second game results in a prize** and the bonus time period runs coincident with the particular point in time, awarding at least a portion of the prize to the player, wherein **once the second game is triggered to play**, a **server conducts all play of the second game** without input from the player **until play of the second game is terminated**.

(Emphasis added.)

The term appears in claim 1 to be used to mean to begin the game –

"receiving a request from a player to play a game at a terminal"  ("Thus, from the

time of the spin (*e.g*., request to play the game at the terminal 140, 170) ..." ('317

Patent at 7:8-11)), or to mean the game is set to begin - "wherein once the second

game is triggered to play…" ("triggered" analyzed in section J below).  The term

also is used either to indicate the entire game from start to finish or the end of the

game – "play of the second game results in a prize" (a prize only results at the end

of the game).  In still another use within claim 1, which was added by amendment

on May 9, 2013, "play" is used to indicate an ongoing set of actions or the entire

game from start to finish - "a server conducts all play of the second game without

input from the player" and "until play of the second game is terminated."

In claim 18, the term appears at least 7 times as follows:

> A computer system for **playing games** comprising
> a. at least one processor; and
> b. a plurality of terminals operatively coupled to the at least one
> processor; wherein the at least one processor is configured to:
> i. **receive a request** from at least one player **to play a game** on one of
> the plurality of terminals;
> ii. at least partially in response to receiving the request from the at
> least one player, **facilitate play of the game** on the one of the
> plurality of terminals;
> iii. at least partially in response to the request from the at least one
> player, establish a bonus time period for the at least one player;
> iv. receive **an indication that play of a secondary game has
> occurred at a particular point in time**, and that **play of the
> secondary game results in a prize**;
> v. determine **whether play of the secondary game occurred during
> the bonus time period** for the at least one player; and
> vi. at least partially in response to **determining that play of the
> secondary game has occurred during the bonus time period** for the

at least one player, award at least a portion of the prize to the at least one player, wherein a sum of all prizes awarded in the secondary game may total an amount that is less than a total amount of a prize pool associated with the secondary game.

(Emphasis added.)

In this claim, the term appears to be used to mean to begin the game – "receive a request...to play a game" ("Thus, from the time of the spin (*e.g.*, request to play the game at the terminal 140, 170) ..." ('317 Patent at 7:8-11)). The term also is used to indicate the entire game from start to finish, a portion of the game, or possibly a single moment of the game depending on the construction of the associated terms – "an indication that play of a secondary game has occurred at a particular point in time," "determining that play of the secondary game occurred during the bonus time period."  The term also is used either to indicate the entire game from start to finish or the end of the game – "...play of the secondary game results in a prize."  In still another instance, the term is used to indicate an ongoing action - "facilitate play of the game."

As illustrated from the above there are multiple different possible meanings for the term "play" within each claim, none of which is appropriate for every use Friedman Dec. at ¶61 and thus the term is indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371.  Epic Tech's proposal of "plain and ordinary meaning" does nothing to resolve this issue.

9

### B. Play a Game – (Claims 1 and 18) – Indefinite.

For the reasons stated above, the term "play" is indefinite.  The term "play a game," in addition to being indefinite due to its association with the indefinite term "play" also is indefinite because a person of ordinary skill in the art ("POSITA") would not know how to construe this term. Friedman Dec. at ¶¶62-64.  As indicated above, claim 1 utilizes the term "play a game" in the preamble ("play an electronic game on a terminal") and again in section a. ("receiving a request from a player to play a game at a terminal").  Claim 18 utilizes this term in section b.i. ("receive a request from at least one player to play a game on one of the plurality of terminals").  According to the specification:

> [1] Thus, from the time of the spin (*e.g.*, request to play the game at the terminal 140, 170)..." (*Id.* at 7:8-11)

> [2] In some embodiments, the player may pay a fee to play the standard game...For example, a player pays a first fee, such as $0.25, to play the standard game, and at the same time pays an additional contribution fee, such as $0.02, to win a prize from the secondary game if the player is eligible to win when the secondary game is played. (*Id.* at 3:45-51).

However, the specification also discloses: [3] "In various embodiments, the game terminal may have a plurality of games that a player may choose from when the player logs into the terminal."  Thus, it is unclear from the specification whether "play a game" means: "from the time of the first spin" [1], the entire game from start to finish [2] or a particular game selected

10

from the plurality of games [3]. Friedman Dec. at ¶63.  While it is more likely that it was intended as either construction [1] or [2], the fact remains that there is no way to be certain – especially in light of the multiple different uses of the term "play". Friedman Dec. at ¶¶62-64. As such, the term "play a game" is indefinite.  Epic Tech's proposal of "plain and ordinary meaning" does nothing to resolve this issue.

## C. Play of a Game/Play of the Second Game (Claims 1 and 18) – Indefinite.

For the reasons stated above, the term "play" is indefinite.  The terms "play of a game" and "play of a second game," in addition to being indefinite because of their association with the indefinite term "play," also are indefinite because a POSITA would not be able to reconcile the multiple different uses of the terms within the same claim.  Friedman Dec. at ¶¶65-73.  As indicated above, claim 1 utilizes these terms in elements b. ("facilitating play of the game at the terminal"), d. ("receiving an indication that play of a second game occurs at a particular point in time"), f. ("determining…whether play of the second game results in a prize"), and g. ("if play of the second game results in a prize…a server conducts all play of the second game…until play of the second game is terminated").

Claim 18 utilizes this term in sections ii. ("…facilitate play of the game on the one of the plurality of terminals"), iv. ("…an indication that play of a

secondary game has occurred at a particular point in time, and that play of the secondary game results in a prize"), v. ("determine whether play of the secondary game occurred during the bonus time period") and vi. ("at least partially in response to determining that play of the secondary game has occurred during the bonus time period").

 As illustrated from the claim language itself, the term "play of a game" is used in each claim differently to have at least three (3) different meanings (claim 18 has 4). Friedman Dec. at ¶¶62-64.  For example, it can mean (1) the entire game (claim 1 - "facilitating play of the game at the terminal," "determine whether play of the secondary game occurred during the bonus time period," claim 18 – "facilitate play of the game on the one of the plurality of terminals"); (2) an ongoing action or the entire game (claim 1 - "receiving an indication that play of a second game occurs at a particular point in time," claim 18 – "an indication that play of a secondary game has occurred at a particular point in time"); (3) either the entire game or the end of the game (claim 1 – "determining…whether play of the second game results in a prize," claim 18 – "an indication…that play of the secondary game results in a prize"); and (4) an incremental sequence of events (claim 1 – "a server conducts all play of the second game," "until play of the second game is terminated").  Further, in a May 9, 2013, amendment the patentee

amended the claim to change from "facilitating a play of the game" to "facilitating play of the game" which would indicate that play of the game in this case means a series of plays of the same game as one would normally do when sitting down at a slot machine.  Friedman Dec. at ¶72.

As illustrated, there are multiple different meanings for the term "play of a game" within each claim, none of which is appropriate for every use Friedman Dec. at ¶64. thus the term is indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371. Epic Tech's proposal of "plain and ordinary meaning" does nothing to resolve this issue.

### D. Bonus Time Period – (Claims 1 and 18) – Indefinite. (modified from Pen-Tech's Patent L.R. 6.2 Disclosure)

The term "bonus time period" appears in both independent claims of the '317 Patent and is vague and ambiguous.  Each claim, *inter alia*, includes "establish[ing] a bonus time period…." However, there is no defining language within the claims with which to understand what "bonus time period" means other than the fact that the bonus time period and the particular point in time must overlap for the player to win a prize ("if play of the second game results in a prize and the bonus time period runs coincident with the particular point in time, awarding at least a portion of the prize to the player…" - claim 1; "receive an indication that play of a secondary game has occurred at a particular point in time,

and that play of the secondary game results in a prize…at least partially in response to determining that play of the secondary game has occurred during the bonus time period…award at least a portion of the prize to the at least one player…" – claim 18).  Accordingly, a POSITA would need to examine the specification and prosecution history to attempt to understand this term.  However, the term "bonus time period," which is not is not a term of art in the gaming industry, Friedman Dec. at ¶75. is used throughout the specification, but never defined.  Instead, the term is used to represent different things throughout the specification and the Patent Examiner allowed the claims based on a specific aspect of the term; namely, "[w]hen the user requests to play the electronic game, a bonus time period may or may not be established depending on if the user requests to play the electronic game before a timer times out.  If the second game is played during the bonus time period, the user is awarded a prize associated with the play of the second game."  (July 19, 2013, Notice of Allowability, Reasons for Allowance).  The Patent Owner did not dispute the Examiner's Reason for Allowance.  Thus, under this construction the bonus time period is a period of time established only if the player submits a request to play a game during a certain defined period of time, during which the entire second game must play for the user to be awarded a prize.  This construction finds support in the specification at 6:60-

14

7:5 and 8:7-22.  Additionally, in a March 4, 2013, amendment, the Patent Owner,

attempting to distinguish the claimed invention from the Gilmore Patent stated:

> The teaching of a bonus timer that makes a player aware that their
> eligibility to continue to play a bonus progressive game is about to end
> is neither a teaching nor suggestion of awarding a player a bonus time
> period that must run concurrent with a particular point in time when a
> second game plays. That is, in the pending claims, the system checks to
> see whether the second game plays (*e.g.*, the particular point in time)
> concurrent with the bonus time period. Said another way, in the claimed
> system a player is not eligible to win a prize that results from play of
> the second game if the particular point in time (*e.g.*, the time when the
> second game plays) does not occur during the player's awarded bonus
> time period.

This Patent Owner argument further supports the construction that the bonus time

period is a period of time, which apparently is not a timer, during which the second

game must play from start to finish for a player to receive a prize.  However, in the

specification at the Abstract and at 4:56-59, the bonus time period is simply a

period of time during which the second game must trigger ("This account card is

associated with an account that the player may use to play the game on a game

terminal 140, 170 and earn eligibility to win prizes when the secondary game is

triggered").  There is no way to determine which of these constructions should

apply to the claims because neither one makes sense in the claims. Friedman Dec.

at ¶¶74-83. For example, if "bonus time period" means a period of time during

which the second game must trigger then claim 1 requires the second game to

result in a prize as soon as it triggers (*i.e.* before it begins) since the following three (3) connected events are required by the claim: (1) play of the second game occurs at a particular point in time, (2) the bonus time period runs coincident with the particular point in time and (3) play of the second game results in a prize.  In other words, if the logic of the claim language is followed, the "bonus time period" requires the play of the second game to both trigger and result in a prize at the same time – which is nonsensical.  However, if "bonus time period" means a period of time during which the second game must play from start to finish then the logic of the claim language of claim 1 requires a particular point in time to actually be a duration of time that lasts at least as long as the second game, rather than a point in time, which is equally nonsensical.  Claim 18 suffers from the same conflict.

Since "bonus time period" is susceptible to multiple different meanings, none of which is appropriate for every use Friedman Dec. at ¶83. the term is indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371.

**E. Occurs/Occurred – (Claims 1 and 18) - Takes place/took place.**

As an initial matter, the word "occur," as defined in the Oxford Dictionaries (a true and correct copy of which is attached as Exhibit 5 hereto) means "happen; take place."  The Parties essentially agree on the construction of the term "occur,"

which in one tense or the other can be found in the independent claims of the '317 Patent.  According to claim 1, "[something] receiving an indication that play of a second game occurs at a particular point in time," and according to claim 18, "the at least one processor is configured to…receive an indication that play of a secondary game has occurred at a particular point in time…determine whether play of the secondary game occurred during the bonus time period…and…in response to determining that play of the secondary game has occurred during the bonus time period…award at least a portion of the prize…"  Regardless of what "play of a second game" or "a particular point in time" or "a bonus time period" means, play of the second game occurs/takes place (claim 1) or occurred/took place (claim 18) during one of (claim 1) or both (claim 18) events.  Notably, the term "occur" in either present or past tense does not mean "trigger" as the claim language specifically distinguishes this language.  For example, claim 1 requires "play of a second game occurs…" in one section but then it requires "…wherein once the second game is triggered to play…" in a later section.  Thus, clearly the claim language itself differentiates between the play of the second game occurring and the second game triggering.  Additionally, "occur" cannot mean from the time of the spin because as seen from the above examination of "play" that is defined as

the "request to play a game" ("Thus, from the time of the spin (*e.g.*, request to play

the game at the terminal 140, 170) ..." (7:8-11)).

**F. Particular Point in Time – (Claims 1 and 18) – Indefinite.**

The term "particular point in time" is found in the independent claims of the

'317 Patent and is vague and ambiguous.  The independent claims requires an

"indication that play of a second game occurs at a particular point in time" and an

"indication that play of a secondary game has occurred at a particular point in

time."  The use of the word "at" in both cases would indicate that "a particular

point in time" is a single instance (as proposed by Epic Tech).  However, "play of

a second/secondary game" which is what occurs/has occurred does not take place

in an instant.  Claims 1 and 18 require in one form or another that play of the

second game results in a prize.  Thus, "play of the second game" which "results in

a prize," must at least include a duration of time.  Claim 1 also recites "a server

conducts all play of the second game…until play of the second game is

terminated" which would also indicate that the "particular point in time," which is

when "play of the second game occurs," is a period of time greater than an instant

(because play of the second game is greater than an instant).  Thus, an unresolvable

inconsistency within the claim language exists. Friedman Dec. at ¶¶89-94.  As

illustrated above, the "particular point in time" implies a single instant but it cannot

be because the "play of the second game" requires a duration of time.  Even if it were an instant, there is no indication which instant it would be since it cannot be the triggering of the game which is recited in the claim as triggered to play, and cannot be the start of the reels spinning, which is recited in the claims as request to play a game.

There is no language in the specification that resolves the inconsistency of a "particular point of time".  Friedman Dec. at ¶94.  As such, the term "particular point in time" is indefinite.  *Media Rights Techs., Inc.* 800 F.3d at 1371.

### G. Coincident With – (Claim 1) - Sharing a common time with.

The term "coincident with" is found in claim 1 of the '317 Patent as follows: "determining if the bonus time period runs coincident with the particular point in time…."  Notably, every time the term is used in the claims and specification it is used in conjunction with the term "runs" (*i.e.*, "runs coincident with").  As illustrated above, both "bonus time period" and "particular point in time" are indefinite terms.  The indefiniteness notwithstanding, because the two requirements must "run coincident with" each other, there must be a duration of time associated with coincident, because otherwise the bonus time period and the particular point in time would simply be coincident with each other.  Additionally, in a March 4, 2013, amendment the applicant argued "the system checks to see

whether the second game plays (*e.g.*, the particular point in time) concurrent with the bonus time period…There is no teaching in Gilmore for a system to determine whether play of a second game occurs coincident with an awarded bonus time period…" The applicant's interchangeable use of "concurrent" and "coincident" without differentiating the claims to which it was referring, indicates that there is a measurable period, not just an instant, of concurrency. As such, the correct construction should be sharing a common time with, wherein the common time is not simply an individual moment in time.

### H. The First Game – (Claim 1) – Indefinite.

The term "the first game" is found exactly three (3) times within the '317 Patent - claim 1 which recites "determining, while the player is playing the first game, whether play of the second game results in a prize," in the abstract which recites "[t]his allows the player to play a first game that earns them eligibility to win another game that is played in the background," and at Col. 3:14-19 which recites "[t]his configuration allows the players on the individual gaming terminals to play a first game that earns them eligibility to potentially win the secondary game that is played in the background, which provides an enjoyable experience for the player and encourages them to continue to play on the gaming terminal."

(Notably the last citation does not state that it provides an enjoyable experience for the player…to continue to play "the first game" on the gaming terminal).

As an initial matter, the term "the first game" was added to claim 1 in a March 4, 2013, amendment, but there is no antecedent basis for this term.  As such, it should have been "a first game" not "the first game."  Additionally, there is no way for a POSITA to determine if "the first game" is a single instance of a particular game (Abstract and Col. 3:14-19) or if it is the first game in a list of potential games (Col. 12:35-39: "In alternate embodiments, the games played may include bingo, lottery, Keno or poker. In various embodiments, the game terminal may have a plurality of games that a player may choose from when the player logs into the terminal.") or if it is multiple instances of the same game or single/multiple instances of different games.  Friedman Dec. at ¶¶98-101.

Since the term "the first game" has multiple potential definitions but no definitive choice, the term is indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371.

## I.  Playing the First Game (Claim 1) – Indefinite.

As indicated above, the term "the first game" was added by amendment, lacks proper antecedent basis, is indefinite, and is only recited three (3) times in the entire '317 Patent.  As also seen from the above analysis, "play" and its various

forms is also indefinite.  "Playing the first game" was added by the March 4, 2013, amendment and is indefinite for the same reasons that both "play" and "the first game" are indefinite.  It is impossible to ascertain whether "playing the first game" means playing the first of many instances of a specific game, whether it means playing the first game in a list of games or playing the standard game as opposed to the bonus game.  Friedman Dec. at ¶¶102-106.  The problem further is exacerbated by the fact that playing the first game within the scope of claim 1 must be different from both playing the game and playing the second game.  The term "playing the first game" is indefinite.

**J.  Triggered to Play – (Claim 1) – Set to Begin.**

"Triggered to play" is found in claim 1 of the '317 Patent: "wherein once the second game is triggered to play, a server conducts all play of the second game…."  According to the specification:

> Referring to FIG. 6C, the secondary display 190 is shown displaying a notice 326 that indicates to all of the players that play of the secondary game has been triggered. In various embodiments, the notice is a countdown timer that indicates the number of seconds until the reels on the secondary display 55 is spun to display the results. (11:50-56.)

Thus, when the second game is "triggered to play" it does not mean that the second game actually begins or plays. Friedman Dec. at ¶¶108-109.  Instead, it means that the second game is "set to begin" when the countdown timer reaches zero.

**K. Without Input from the Player (Claim 1) – Indefinite.**

The term "without input from the player" is found in exactly one place in the '317 Patent - claim 1.  This term was added by amendment on May 9, 2013, which included "wherein once the second game is triggered to play, a server conducts all play of the second game without input from the player until play of the second game is terminated."  It is unclear from the claim what this term means and there is no disclosure in the specification or reference which would clarify the meaning. This term can equally mean that the player cannot play the standard game while the second game is being played, or that the player's input does not affect the second game or that the player does not have the ability to provide input to the second game. Friedman Dec. at ¶¶110-117.

According to the specification: "Embodiments of the present system support games structured for all game styles known in the art" (2:66-67) and "[i]n various embodiments, the secondary game server 130 follows a similar procedure as the game terminals 140, 170 in choosing the reel display that corresponds to the result" (11:63-65).  Notably, in conventional casino games a player can manually stop the reels from spinning.  Friedman Dec. at ¶114. If the secondary server follows a similar procedure as the game terminals, then it would allow a player to manually stop the reels from spinning during the second game – which is in direct contrast to

the added claim language.  Since there is no support for this language and the term is subject to multiple potential definitions with no definitive choice, the term is indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371.

### L. Receiving Requests from a Plurality of Players to Play a Game (Claim 7) – Indefinite.

Aside from the fact that "play a game" is indefinite for the reasons stated above, the term " receiving requests from a plurality of players to play a game" is also indefinite because the term is vague and ambiguous.  Claim 7, which recites this language, depends from claim 1, which recites "[a] computer-implemented method of allowing a user to play an electronic game on a terminal…receiving a request from a player to play a game at a terminal."  Thus, the term "receiving requests from a plurality of players to play a game" would require a single terminal to receive requests from multiple players to simultaneously play different games on the same terminal (the use of the antecedent "a" for game in claim 7 means that this is a different game from the game in claim 1, otherwise the antecedent would be "the" or "said").  This poses at least two problems; namely, the multiple uses of "a game" within the same claim to refer to different games is unresolvable when trying to figure out which game is being referred to and there is no disclosure in the specification of a single terminal simultaneously offering game play to multiple players.  Friedman Dec. at ¶¶118-124.

Since there is no support for this language and the term is subject to multiple potential definitions with no definitive choice, the term is indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371.

### M. At Least One Processor (Claim 18) - One or more processors working together.

The term "at least one processor" is found in claim 18.  When "at least one processor" includes multiple processors, the processors must be working together or the claim becomes indefinite.  The claim requires the "at least one processor" to perform 6 numbered steps (i. – vi.).  However, the claim does not enumerate which step will be performed by which processor or if all steps are performed by all processors.  Instead, it recites: "wherein the at least one processor is configured to…" then it lists the 6 steps.  Thus, for the claim to be definite, the "at least one processor" must be working together when there are multiple processors.  Friedman Dec. at ¶¶125-128.  If not, then the term "at least one processor" is subject to multiple potential definitions with no definitive choice, Friedman Dec. at ¶127. which would make the term indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371.

## V. CONCLUSION

The claim constructions Pen-Tech proposes are faithful to the intrinsic evidence.

This 18th day of February 2022.

FISHERBROYLES, LLP

 /s/ Richard Lehrer_____
RICHARD LEHRER
(admitted *pro hac vice*)
richard.lehrer@fisherbroyles.com
109 Normandy Drive
Woodstock, GA 30188
Tel: 845-519-9525

VINCENT BUSHNELL
Georgia Bar No. 098999
vincent.bushnell@fisherbroyles.com
945 East Paces Ferry Rd. NE
Suite 2000
Atlanta, Georgia 30326
Tel: 678-902-7190
*Attorneys for Defendant/Counterclaim*
*Plaintiff Pen-Tech Associates, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing PEN-TECH ASSOCIATES, INC.'S

OPENING CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 8,545,317

has been prepared in 14-point Times New Roman font and complies with LR 5.1,

NDGa and LR 7.1(D), NDGa.

/s/ Richard Lehrer
Richard Lehrer
admitted *pro hac vice*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EPIC TECH, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | CASE NO. 1:20-cv-02428-MHC |
| v. | ) | |
| | ) | |
| PEN-TECH ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| _____ | ) | |

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2022, I caused the foregoing document

(PEN-TECH ASSOCIATES, INC.'S OPENING CLAIM CONSTRUCTION

BRIEF FOR U.S. PATENT NO. 8,545,317) to be filed with the Clerk of Court

using the CM/ECF system, which automatically will send an electronic mail

notification to the following attorneys of record:

L. Clint Crosby
ccrosby@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell
& Berkowitz, PC


/s/ Richard Lehrer
Richard Lehrer
admitted *pro hac vice*