# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

EPIC TECH, LLC,                 )

Plaintiff/Counterclaim Defendant,    )

v.                           )    CIVIL ACTION NO.
                             )    1:20-cv-02428-MHC

PEN-TECH ASSOCIATES, INC.,      )

Defendant/Counterclaim Plaintiff.    )

_____ )

## PLAINTIFF EPIC TECH, LLC'S OPENING
## CLAIM CONSTRUCTION BRIEF

## **Table of Contents**

Table of Authorities ........................................................................................ ii

Table of Exhibits ........................................................................................... iv

Introduction and Background ..........................................................................1

Construction of Claim Terms...........................................................................2

   I.     Applicable Law On Claim Construction ...................................................2

   II.    Agreed Constructions ............................................................................7

   III.   Plaintiff's Proposed Claim Constructions Are Fully Supported and
         Should Be Adopted...........................................................................7

      a. "play" / "play a game" / "play of the game" ...........................................8

      b. "bonus time period"..........................................................................12

      c. "occurs" / "occurred" ........................................................................14

      d. "particular point in time" ...................................................................14

      e. "coincident with" .............................................................................17

      f. "the first game" / "playing the first game"...............................................17

      g. "play of the second game".................................................................20

      h. "triggered to play" ...........................................................................21

      i. "without input from the player" .............................................................22

      j. "receiving requests from a plurality of players to play a game"................23

      k. "at least one processor" ....................................................................24

Conclusion ....................................................................................................25

## Table of Authorities

Cases                                                                                                  Page

*Advanced Media Networks, LLC v. AT&T Mobility LLC*,
   748 F. Appx. 308 (Fed. Cir. 2018) ........................................................................3

*Aventis Pharm. Inc. v. Amino Chemicals Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013) ...........................................................................10

*Cias, Inc. v. Alliance Gaming Corp.*,
   504 F.3d 1356 (Fed. Cir. 2007) .............................................................................5

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
   838 F.3d 1224 (Fed. Cir. 2016) .............................................................................6

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012) .............................................................................3

*Embrex, Inc. v. Serv. Eng'g Corp.*,
   216 F.3d 1343 (Fed. Cir. 2000) .............................................................................4

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ..................................................................................................5

*In re Packard*,
   751 F.3d 1307 (Fed. Cir 2014) ..............................................................................6

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) .........................................................................2, 5

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
   336 F.3d 1308 (Fed. Cir. 2003) .............................................................................6

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) .............................................................................3

*Microprocessor Enhancement v. Texas Instruments*,
   520 F.3d 1367 (Fed. Cir. 2008) ...........................................................................10

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
   415 F.3d 1335 (Fed. Cir. 2005) ...........................................................................19

*Nautilus, Inc. v. Biosig Instruments*,
   134 S. Ct. 2120 (2014) ...........................................................................................6

*O2 Micro Int'l. Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) ..............................................................................4

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ......................................................................2, 3, 4, 5

*Phonometrics, Inc. v. N. Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998) ..................................................................10, 12, 13

*Renishaw PLC v. Marposs Societa' Per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ................................................................................3, 5

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. 318 (2015) ................................................................................................2

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ..............................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................................3, 5


<u>Statutes</u>

35 U.S.C. § 112(b) ................................................................................................5, 6

## **Table of Exhibits**

Exhibit A - United States Patent No. U.S. 8,545,317

## INTRODUCTION AND BACKGROUND

Pursuant to Patent L.R. 6.5, Epic Tech, LLC ("Plaintiff" or "Epic Tech") hereby submits its Opening Claim Construction Brief as to particular terms of U.S. Patent No. 8,545,317 (the "'317 Patent" or the "Patent").

The technology at issue generally relates to a computer gaming system and method, and, in particular, to an electronic gaming system and method that enables a player to play an initial game as well as a second game-in-game wherein the player becomes eligible to win a prize from the secondary game if the second game is triggered while the player is eligible to win. *See* ' 317 Patent, Abstract.[1]

Pen-Tech Associates, Inc. ("Defendant" or "Pen-Tech") identified eighteen claim terms of the '317 Patent which it proposed required construction. Epic Tech asserted all claim terms should be given their plain and ordinary meaning. Following conferral, the Parties submitted a Joint Claim Construction Statement wherein construction of four claim terms were agreed upon. The constructions of the fourteen remaining claim terms are disputed. *See* ECF Doc. 42.

The claims and terms of the '317 Patent are clear and readily understood by a person of ordinary skill in the art ("POSITA"). Therefore, Epic Tech proposes that

---

[1]   All citations to the specification of the Patent-in-Suit refer to the column and line number of the patent in the following formats (Col. A):(line Y)-(line Z) or (Col. A):(line Y) - (Col. B):(line Z).

the claim terms which Pen-Tech contends require construction have their plain and ordinary meaning, with the exception of two terms for which Epic Tech proposes constructions in response to Pen-Tech's position.   Epic Tech's constructions represent the plain and unambiguous meaning of the terms and are consistent with the intrinsic evidence.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).  Pen-Tech, in contrast, offers litigation-driven constructions that are unsupported by the claim or the specification that contradict the prosecution history, and that are inconsistent with what the terms would mean to a POSITA. Accordingly, Epic Tech respectfully requests that the Court adopt its proposed constructions for the disputed claim terms or otherwise adopt the plain and ordinary meaning of the terms.

## CONSTRUCTION OF CLAIM TERMS

### I.      Applicable Law On Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  For this reason, courts are directed to "look to the words of the claims themselves . . . to define the scope of the patented

2

invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Therefore, the "claim construction inquiry . . . begins and ends in all cases with the actual words of the claims." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

Generally, claim terms are to be given their ordinary and accustomed meaning as understood by a POSITA at the time of invention, because that meaning is presumed to be the correct one.  *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362-63 (Fed. Cir. 1999); *Phillips*, 415 F.3d at 1313.  "Our case law is clear that a claim term should be accorded the full breadth of its plain and ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1280 (Fed. Cir. 2012).  Indeed, "there is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time." *Advanced Media Networks, LLC v. AT&T Mobility LLC*, 748 F. Appx. 308, 311 (Fed. Cir. 2018) (internal quotations omitted).  "A claim term should be given its ordinary meaning in the pertinent context, unless the patentee has made clear its adoption of a different definition or otherwise disclaimed that meaning." *Id.* (citation omitted).

Courts construe patent claims to "understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (citation omitted).  The Court need not always render a construction of claim terms where such construction would not add clarity over and beyond the plain words used in the claim.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *O2 Micro Int'l. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("District courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

When the ordinary meaning of claim language, as understood by a POSITA, is readily apparent, claim construction involves little more than the application of the widely accepted meaning of commonly understood words.  *Phillips*, 415 F.3d at 1314.  A patent is not a document written to a general audience but is, instead, written to those persons practicing in the subject technical field.  *Id*. at 1313 ("Inventors are typically persons skilled in the field of the invention and patents are addressed to and intended to be read by others of skill in the pertinent art.").  When the ordinary

4

and customary meaning is not immediately apparent, courts can look to "those sources available to the public" that show what a POSITA would have understood the term to mean, including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1313 (quoting *Innova/Pure*, 381 F.3d at 1116). *See also Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966); *Vitronics*, 90 F.3d at 1582-83; *Cias, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1361-63 (Fed. Cir. 2007).  Extrinsic evidence may help to explain the meaning of disputed claim terms to a POSITA, but extrinsic evidence, such as a dictionary definition, does not trump intrinsic evidence.  *See Phillips*, 415 F.3d at 1318-19.  Accordingly, the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC,* 158 F.3d at 1250).

The Patent Statute requires the patent application to include claims that particularly point out and distinctly claim the subject matter which the inventor regards as the invention. 35 U.S.C. § 112(b).  While Pen-Tech contends that ten of the fourteen terms submitted for construction are indefinite, what is required for compliance with § 112(b) is only that the patent claims, when read in the context of

5

the specification and prosecution history, inform those skilled in the art of the scope of the invention with reasonable certainty. *Nautilus, Inc. v. Biosig Instruments*, 134 S. Ct. 2120, 2124 (2014). The requirements of U.S.C. 35 § 112(b) are not a demand for "unreasonable precision" in the drafting of the claims. *In re Packard*, 751 F.3d 1307, 1313 (Fed. Cir 2014). Further, indefiniteness must be proven by clear and convincing evidence. *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016). Correspondingly, and not unsurprisingly, findings of indefiniteness are disfavored and close questions of indefiniteness are to be resolved in favor of the patentee. *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003). When applying this guidance to the terms of the '317 Patent, Pen-Tech's claims of indefiniteness cannot be sustained.

## II.     Agreed Constructions

The Parties agree to the constructions of the following four claim terms:

| Term, Phrase or Clause | Agreed Construction |
| --- | --- |
| Establishing (Claims 1 and 18) | Awarding or adding to an existing. |
| Prize (Claims 1 and 18) | A non-zero amount available to win for meeting a particular set of circumstances. |
| Portion of the Prize (Claims 1 and 18) | At least some of the non-zero amount available to win for meeting a particular set of circumstances. |
| Prize Pool (Claim 18) | A non-zero amount available to win for a particular set of circumstances. |

## III.    Plaintiff's Proposed Claim Constructions Are Fully Supported and Should Be Adopted

For the disputed terms and phrases, Pen-Tech has primarily proposed unsupported constructions that repeatedly seek to improperly add limitations to the claims that change the scope of the claims, and only serve to make the claims more difficult to understand.  Conversely, for the vast majority of the disputed terms and phrases, Epic Tech submits that no construction is necessary to aid the Court or jury in understanding the true scope of the claims, and Epic Tech proposes that the plain and ordinary meaning should apply.  For the few terms that could benefit from a

clarifying construction, Epic Tech proposes simple constructions which are supported by the intrinsic evidence.

### a.  "play" / "play a game" / "play of the game"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| **"play"** Claims 1, 18 | |
| Plain and ordinary meaning of "play" does not require construction by the Court. | Indefinite. Should a construction be required, then the term should be construed to mean "start." |
| **"play a game"** Claims 1,18 | |
| Plain and ordinary meaning of "play a game" does not require construction by the Court. | Indefinite. Should a construction be required, then the term should be construed to mean "start a game." |
| **"play of the game"** Claims 1, 18 | |
| Plain and ordinary meaning of "play of the game" does not require construction by the Court. | Indefinite. Should a construction be required, then the term should be construed to mean "start the process of playing the entirety of the game." |

Constructions of the terms "play", "play a game", and "play of the game" have been proposed by Pen-Tech. The proposed constructions of "play a game" and "play of the game" are all predicated on Pen-Tech's construction of "play"; accordingly, these three terms are addressed together. Epic Tech submits these three terms should have their plain and ordinary meaning. The terms are well understood by a POSITA within the context of the Patent. In contrast, Pen-Tech proposes constructions that are inconsistent with the Patent claims and specification.

Pen-Tech's proposed construction that the word "play" means "start" is not supported by the Patent. The term "play" is used in the Patent to indicate a time period while a game is occurring or being played, not just the start of a game. The Patent specification states, "[I]n this way, the display associated with any one prize level changes **from play to play** to make **game play** more interesting to the player." '317 Patent, 11:16-19. The first use of "play" in this sentence implies a period of time while the game is being played, not the start of a game. The second use of "play" in the same sentence means the act of playing the game from its start to finish, not merely and only the start of a game. A POSITA would recognize the plain and ordinary meaning of play in the context of the specification and claims.

The word "play" and its related terms may have separate constructions to a POSITA in interpreting the patent claims. "The same claim term can have different

constructions depending upon the context of how the term is used within the claims and specification." *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1374 (Fed. Cir. 2013); s*ee also Microprocessor Enhancement v. Texas Instruments*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (the context of a claim term's use can be considered to avoid a "non-sensical reading" and there is no requirement that a claim term be used uniformly in the patent.); *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (adopting two constructions of a phrase that was not used consistently throughout the specification).

As with the proposed meaning of the term "play", the term "play a game" should not be limited to mean "start a game" as Pen-Tech suggests.  It should be noted that "play a game" and "play the game" are used interchangeably in the '317 Patent.  "Play a game" cannot mean "start a game" as there are examples in the Patent specification where to "play the game" means a duration of time of the occurrence of the game and not just a point in time when a game is started.  The Patent provides, for example and particularly, "in all of these embodiments, the bonus time period decrements in one second increments whether the bonus time period is a fixed amount or accumulates as the player **continues to play the game**." '317 Patent, 7:21-24. The plain reading and construction of this phrase is

inconsistent with Pen-Tech's efforts to limit "play" to "start" as it relates to duration of play.

Likewise, "play of the game" cannot be limited to mean starting the process of playing the entirety of the game as Pen-Tech suggests. Applying the term's plain and ordinary meaning in the context of the Patent demonstrates that "play the game" encompasses the process of playing the entirety of the game, not just starting it.

For example, the specification refers intrinsically to the end of the game as the point when the play of the game ends. "Once the **play of the game** ends, the method for that player restarts at step 220." '317 Patent, 8:16-17. This is not referring to the end of the start of the process; rather, the specification is referring to the end of the entirety of the process of playing the game.

In another example, the term "play of the game" means finish, i.e., "[d]etermining whether the **play of the second game** results in a prize." '317 Patent, Figure 2, step 212. As used in Figure 2, "play of the game" means finish or end of the game because whether a prize should be awarded as a result of the play implies some activity must have occurred beyond the start of a game. Pen-Tech's construction of the term "play" and its related terms, "play a game", and "play of the game" which all require that "play" means "start" cannot be reconciled with the language of the '317 Patent. A POSITA would recognize the plain and ordinary

11

meaning of the terms play, play a game, and play of the game in the context of the

specification and claims.

### b. "bonus time period"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 1<br>• 18 | A duration of time awarded to a player in addition to, and separate from, what was expected or previously established. | Indefinite |

The term "bonus time period" should be construed to mean a duration of time

awarded to a player in addition to, and separate from, what was expected or

previously established.  The '317 Patent provides for a time period given in addition

to that which was expected:

> In various embodiments, a **bonus time period** is established if a player
> initiates a game play during a defined period of time. In some
> embodiments, the system 100 displays a count-down timer 302 (FIG.5)
> that provides the player an indication of the time remaining for the
> player to spin to become eligible to earn a **bonus time period**.

'317 Patent, 6:60-65.  The specification states that an amount of time may be given

to a player for additional secondary game play to provide the user eligibility for the

second jackpot game during that bonus time period duration based on eligibility

criteria.  *Id.*at 6:62-65.  The bonus time period is not additive to the time or duration

of play of the first game.  The bonus time is associated with eligibility to participate in the secondary game.  *Id.*, Claim 1.

The bonus time period is not predetermined; it can be a fixed amount, or it can accumulate. "[T]he **bonus time** period decrements in one second increments whether the **bonus time period** is a fixed amount or accumulates as the player continues to play the game. '317 Patent, 7:21-24.  For example, the bonus time period may be extended or reset by the player, thus making the bonus time period variable.

> In some embodiments, at step 232, the system 100 determines whether each of the plurality of players who were awarded a **bonus time period** submits additional requests to play the game on terminals 140,170. If additional requests are made by one or more of the plurality of players, at step 234, the system 100 increments the **bonus time period** for each of those players by a predetermined amount of time. In still other embodiments, instead of incrementing the **bonus time period** for a player making an additional request, the system 100 may reset the **bonus time period** for that player to a predetermined amount of time each time that player submits an additional request to play the game on terminal 140, 170.

'317 Patent, 8:23-34.  Epic Tech's proposed construction of "bonus time period" as a duration of time awarded to a player in addition to, and separate from, what was expected or previously established, is consistent with the intrinsic evidence of the '317 Patent and should be adopted.

### c. "occurs" / "occurred"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 1<br>• 18 | Plain and ordinary meaning of "occurs" or "occurred" does not require construction by the Court. | Takes place. |

Epic Tech asserts that this term does not require construction beyond its plain and ordinary meaning.  Pen-Tech's proposed construction is little more than an attempt to replace a term with a synonym.  Further, **occurred** conveys past tense which is not supported by Pen-Tech's proposed construction.

### d. "particular point in time"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 1<br>• 18 | A specific individual moment or instance of time. | Indefinite.<br><br>Should a construction be required then the term should be construed to mean a period of time equal to or greater than the length of the second game. |

Epic Tech submits that the claim term "particular point in time" should be construed as a specific individual moment or instance of time, which is in accordance

14

with the meaning of the words and the phrase as used in the '317 Patent, and as understood by a POSITA.  The "particular point in time" referred to in Claims 1 and 18 is not a duration equal to or greater than the length of the second game, as Pen-Tech suggests.  Rather, it is a moment in time that can occur within a time period running from start of the second game to end of the second game.  This invention of the '317 Patent requires that several things must occur at a particular point in time in order for some portion of the secondary jackpot to be paid out to a user.

> At step 240, the system 100 determines if a prize results from play of the second game and, if a prize does result, at step 242, the system 100 determines whether the prize is a shared prize or an individual prize. At step 244, if the prize is an individual prize, then in various embodiments, the system 100 randomly selects one player from the plurality of players that have a bonus time period that is operative concurrent with the **particular point in time** and awards the prize to that player.

'317 Patent, 9:6-13.  A POSITA would understand this to mean that the "particular point in time" refers to an instance where defined criteria are met, not a period of time equal to or greater than the length of the second game as Pen-Tech suggests. The particular point in time is that instant that all criteria are met to potentially award a prize from the secondary game.  Figure 3 of the Patent illustrates the criteria which must all occur for some portion of the secondary jackpot to be paid out to a player: 1) play of the secondary game,  '317 Patent, Fig. 3:236; 2) the bonus time period is

15

in operation, '317 Patent, Fig. 3:238; and 3) awarding all or a portion of the prize,

'317 Patent, Fig. 3:244, 246.



## FIGURE 3

Considering the invention in light of the specification, the particular point in

time cannot be greater than the length of the second game because it must culminate

in the awarding of a prize, or the game will come to an end if a prize does not result.

As set forth in the specification, "Otherwise, if the bonus time period for the player

runs coincident with the particular point in time, then the system 100 awards at least a portion of the prize to the player." '317 Patent, 7:46-49.  Pen-Tech's construction of a duration impermissibly inserts additional limitations into the claim and is not supported by the intrinsic evidence.

### e.  "coincident with"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 1 | Plain and ordinary meaning of "coincident with" does not require construction by the Court. | Sharing a common time with. |

Epic Tech asserts that this term does not require construction beyond its plain and ordinary meaning.

### f.  "the first game" / "playing the first game"

| Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| "the first game" Claim 1 | |
| Plain and ordinary meaning of "the first game" does not require construction by the Court. | Indefinite.<br><br>Should a construction be required then the term should be construed to mean the first instance of the game at the gaming terminal. |

| **"playing the first game"**<br>Claim 1 | |
|---|---|
| Plain and ordinary meaning of "playing the first game" does not require construction by the Court. | Indefinite.<br><br>Should a construction be required then the term should be construed to mean engaging in the operation of the first instance of the game at the gaming terminal. |

Epic Tech asserts that these terms do not require construction beyond their plain and ordinary meaning.  The term "the first game" in Claim 1 only appears once, with the word "playing" preceding it.  '317 Patent, 12:56-57.  Accordingly, the constructions of the terms "the first game" and "playing the first game" are discussed here together.   The meaning of "the first game" is understood from the claim language and specification by a POSITA.  Pen-Tech's proposed construction is not a valid construction because it is ambiguous as to "first instance of the game."

Pen-Tech is also improperly importing the limitation of "at the gaming terminal" into its construction of both "the first game" and "playing the first game." The words "at the gaming terminal" are not found in Claim 1.  In fact, the phrase "at the gaming terminal" is *absent* from the '317 Patent entirely.  "Unless required by the specification, limitations that do not otherwise appear in the claims should not

be imported into the claims." *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed. Cir. 2005).

As proposed by Pen-Tech, "the first instance of the game at the gaming terminal" could mean that only the first time (instance) the first game is played should be considered "the first game." However, the first game can be played multiple times as long as the player continues to play the first game (i.e. a slot machine type game), such that the first instance of the game is not the only instance of the first game applicable to Claim 1.

The Patent uses the term "first game" to distinguish between the game initiated at the gaming terminal and the "secondary game", aka game-in-game, which is played in the background.  "This configuration allows the players on the individual gaming terminals to play a **first game** that earns them eligibility to potentially win the secondary game that is played in the background, which provides an enjoyable experience for the player and encourages them to continue to play on the gaming terminal." '317 Patent, 3:14-19.

Further, Pen-Tech's construction is inconsistent with its proposed construction of the term "play" to mean "start".

### g. **"play of the second game"**

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 1<br>• 18 | Plain and ordinary meaning of "play of the second game" does not require construction by the Court. | Indefinite.<br><br>Should a construction be required then the term should be construed to mean the second game has been operated from start to finish. |

Epic Tech asserts that this term does not require construction beyond its plain and ordinary meaning.  Pen-Tech's construction is not consistent with the ordinary meaning of the words because the proposed construction imposes an element of completion of the game play.  Further, this proposed construction is not consistent with Pen-Tech's proposed constructions of "play" or "play of the game" which it asserts should mean the start of a game, not operating the game from start to finish.

The term "play of the second game" does not encompass the entirety of game play or any specific point in game play of the second game.  The Patent uses the term to refer to an ongoing active condition of the second game, not merely its start, completion, or the entirety of its operation.

> In various embodiments, the system 100 captures and records information regarding those players who have a bonus time period that is operative concurrent with the particular point in time, and displays an indicator on the player's respective terminal to notify the player that

the **play of the second game** is occurring and that the player is eligible
to participate.

'317 Patent, 8:53-60.  This concept of play duration is well understood by a POSITA.

Therefore, a construction of the term using its plain and ordinary meaning most

naturally aligns with the Patent's description of the invention.

### h.  <u>"triggered to play"</u>

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 1 | Plain and ordinary meaning of "triggered to play" does not require construction by the Court. | Set to begin. |

Epic Tech asserts that this term does not require construction beyond its plain

and ordinary meaning.  Pen-Tech's proposed construction fails to reflect the reality

of the Patent.  The use of the term "triggered to play" in Claim 1 refers to the second

game:  "The second game can be triggered to play using any suitable means."  '317

Patent, 7:29-30.  The second game plays in the background.  It is not played by the

player and there is no period where it is "set to begin" as a traditional lottery game

would be when waiting for payment or the push of a button.  Rather the second game

is either playing or not playing at any given time.  As stated in Claim 1 (g), "once

the second game is triggered to play, a server conducts all play of the second game

without input from the player until play of the second game is terminated."  '317

Patent, 12:62-64.  The word "triggered" appears in the past tense in this sentence

because the term means that the game has begun -- the proverbial trigger has been

pulled.  Accordingly, the ordinary meaning of the words "triggered to play" should

apply to this term in Claim 1.

### i. "without input from the player"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 1 | Plain and ordinary meaning of "without input from the player" does not require construction by the Court. | Indefinite. |

Epic Tech asserts that this term does not require construction beyond its plain

and ordinary meaning.  As explained in the previous proposed term construction, the

use of "without input from the player" in Claim 1 refers to the play of the second

game which plays in the background.  "Actual play of the secondary game is carried

out by secondary game server 130" '317 Patent, 12:9-10.  The abstract further states,

"A secondary game system, in various embodiments, comprises a system of

networked game terminals where a player playing a game on a game terminal can

earn eligibility to win a prize from a secondary game that plays simultaneously in

the background." '317 Patent, Abstract.  The specification clearly explains that the

secondary game is fully controlled by a server, not by a player. "Once play of the secondary game is triggered, the secondary game server selects an electronic ticket from a fixed number of electronic tickets associated with the sweepstakes game for the secondary game." '317 Patent, 11:56-59. As explained in the Patent, the secondary game is conducted without input from the player as it is conducted on a remote, separate server. The term should be given its plain and ordinary meaning.

### j. "receiving requests from a plurality of players to play a game"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 7 | Plain and ordinary meaning of "receiving requests from a plurality of players to play a game" does not require construction by the Court. | Indefinite.<br><br>Should a construction be required then the term should be construed to mean a single terminal receives requests from two or more players to start the same game. |

Epic Tech asserts that no construction of this term is necessary other than giving the term its plain and ordinary meaning.

Further, Pen-Tech's proposed construction of a "single terminal" receiving requests from multiple players is not correct because the specification does not indicate there are multiple players using the same terminal at the same moment. Two

such examples state that multiple players are using multiple terminals by using the plural form of the word terminal or by differentiating between terminals.  "At step 222, the system 100 receives from a plurality of players on the **terminals** 140, 170 a plurality of requests to play a game on the individual **terminals**." '317 Patent, 7:67-8:3.  "At step 256, the system 100 receives a request from a second player to play a second game on **another terminal** 140, 170." '317 Patent, 9:30-32.  Pen-Tech's proposed construction that multiple players are using one terminal is wholly inconsistent with the guidance from the specification and impermissibly and arbitrarily seeks to insert an additional limitation into the claims which limitation lacks any intrinsic support that the inventor believes such to be the subject matter of the invention.

### k.  "at least one processor"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| • 18 | Plain and ordinary meaning of "at least one processor" does not require construction by the Court. | One or more processors working together. |

Epic Tech asserts that this term does not require construction beyond its plain and ordinary meaning.  Pen-Tech's proposed construction adds language requiring processors to work together, but this is not a requirement of the Patent but a dreamed-

24

up additional limitation lacking intrinsic support.  Indeed, the words "at least one processor" have nothing to do with the way the processor or processors operate or work; the term merely indicates the minimum number of possessors required in the invention.  "A computer system for playing games, in various embodiments, comprises at **least one processor**, and a plurality of terminals operatively coupled to the **at least one processor.**"  '317 Patent, 2:22-24.

Further, the plain meaning of "at least one" is "one or more."  Pen-Tech's proposed construction requires that one processor must be "working together" but as only one processor may exist, this is a nonsensical construction.  The plain and ordinary meaning of this term is sufficient to understand the claim language.

## CONCLUSION

The majority of the claim terms proposed for construction by Pen-Tech do not require construction as use of the plain and ordinary meaning of the terms is appropriate.  For the remainder of the terms, Epic Tech's constructions represent the construction of the terms in accord with the intrinsic evidence.  Because Epic Tech's constructions are true to the claim language and most naturally align with the specification, Epic Tech respectfully requests the Court adopt its constructions.

Respectfully submitted this 18th day of February 2022.

> **BAKER, DONELSON, BEARMAN**
> **CALDWELL & BERKOWITZ, PC**
>
> */s/ L. Clint Crosby*
> L. Clint Crosby, Esq.
> Georgia Bar No. 197877
> Monarch Plaza, Suite 1500
> 3414 Peachtree Road NE
> Atlanta, Georgia 30326
> Tel: 678-406-8702
> Fax: 678-406-8802
> ccrosby@bakerdonelson.com
>
> *Counsel for Plaintiff*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the foregoing *Plaintiff*

*Epic Tech, LLC's Opening Claim Construction Brief* by filing the same using the

Court's ECF system, which will automatically send notification to the following

counsel of record:

Vincent Bushnell, Esq.           Richard Lehrer, Esq.
FISHER BROYLES, LLP        FISHER BROYLES, LLP
945 East Paces Ferry Rd. NE, Ste 2000   109 Normandy Drive
Atlanta, Georgia 30326          Woodstock, GA 30188
vincent.bushnell@fisherbroyles.com    richard.lehrer@fisherbroyles.com

This 18th day of February 2022.

*/s/ L. Clint Crosby*
L. Clint Crosby
Georgia Bar No. 197877

*Counsel for Plaintiff*