UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

EPIC TECH, LLC, )
 )
 Plaintiff/Counterclaim Defendant, )
 ) CASE NO. 1:20-cv-02428-MHC
 v. )
 )
PEN-TECH ASSOCIATES, INC., )
 )
 Defendant/Counterclaim Plaintiff. )
_____)

## PEN-TECH ASSOCIATES, INC.'S
## BRIEF IN RESPONSE TO EPIC TECH'S OPENING CLAIM
## CONSTRUCTION BRIEF

FISHERBROYLES, LLP

RICHARD LEHRER
(admitted *pro hac vice*)
richard.lehrer@fisherbroyles.com
109 Normandy Drive
Woodstock, GA 30188
Tel: 845-519-9525

VINCENT BUSHNELL
Georgia Bar No. 098999
vincent.bushnell@fisherbroyles.com
945 East Paces Ferry Rd. NE
Suite 2000
Atlanta, Georgia 30326
Tel: 678-902-7190

*Attorneys for Defendant/Counterclaim Plaintiff Pen-Tech Associates, Inc.*

# CONTENTS

I.  MISTATEMENTS OF LAW...........................................................................1

II.  DISPUTED CLAIM TERMS ........................................................................3

A.  Play/Play a Game/Play of the Game/ Play of the Second Game – ...............3

Indefinite. .....................................................................................................3

1.  Play – Indefinite. ................................................................................4

2.  Play a Game – Indefinite............................................................................5

3.  Play of a Game/Play of the Second Game – Indefinite. ...........................6

B.  Bonus Time Period – Indefinite. ..................................................................7

C.  Occurs/Occurred – Takes Place/Took Place. ................................................9

D.  Particular Point in Time – Indefinite.............................................................9

E.  Coincident With – Sharing a Common Time With.......................................10

F.  The First Game/Playing the First Game – Indefinite...................................11

G.  Triggered to Play – Set to Begin. .................................................................12

H.  Without Input from the Player – Indefinite...................................................12

I.  Receiving Requests from a Plurality of Players to Play a Game –

Indefinite. .........................................................................................................14

J.     At Least One Processor - One or More Processors Working Together.......15

**III.  CONCLUSION........................................................................................16**

**Cases**

*Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1374 (Fed. Cir. 2013) ..............................................................................................2, 5

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003) ....................................................1, 2

*Microprocessor Enhancement v. Texas Instruments*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ..............................................................................................2

*Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1359 ..................................2

*Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998).....2, 3

Defendant/Counterclaim Plaintiff Pen-Tech Associates, Inc. ("Pen-Tech"), hereby responds to Plaintiff/Counterclaim Defendant Epic Tech, LLC's ("Epic Tech") opening claim construction brief ("Epic Tech's Brief"), which is rife with misstatements of the facts and law, ignores the majority of Pen-Tech's assertions of indefiniteness and proposes claim constructions that are generally contrary to the intrinsic evidence.

The following analysis demonstrates that Epic Tech's proposed claim constructions violates various well-established canons of claim construction. Accordingly, Epic Tech's proposed claim constructions should be rejected, and Pen-Tech's should be adopted.

## I.      MISTATEMENTS OF LAW

Epic Tech cites *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003) for the proposition that "findings of indefiniteness are disfavored and close questions of indefiniteness are to be resolved in favor of the patentee." (Epic Tech's Brief at 6.) However, the *IPD* court makes no such assertion. *IPD* instead states that findings of indefiniteness require clear and convincing evidence, and for a "summary judgment motion" (notably not claim construction) the Court will view the

evidence "in the light most favorable to the party opposing the motion and resolve all doubts in favor of the non-movant." *Id.* at 1313, 1319.

Epic Tech further cites *Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1374 (Fed. Cir. 2013) and *Microprocessor Enhancement v. Texas Instruments*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) for the incorrect proposition that the same claim term may have different constructions within the same claim.[1] (Epic Tech's Brief at 10.) However, these cases instead hold (a holding that is inconsistent throughout the caselaw) that claim terms may be construed differently in different claims. (*See e.g.*, *Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1359, which holds the exact opposite: "It is well-established, however, that claim terms are to be construed consistently throughout a patent." (citation omitted).)

Finally, Epic Tech cites *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998), for the incorrect proposition that the Court can

---

[1] The *Aventis* Court actually asserts that claim terms within the same claim must be construed consistently: "While 'substantially pure' refers to both the CPK intermediate and the piperidine derivative end product in the specification, the term 'substantially pure' is used only in reference to the CPK intermediate in relevant claims 1, 6, and 7…The lack of any 'substantially pure' limitation on the piperidine derivative end products in claims 1, 6, and 7 obviates any explicit requirement to apply a construction of 'substantially pure' that is consistent for both the CPK intermediate and the piperidine derivative end product." *Aventis Pharm. Inc.* 715 F.3d at 1374.

"adopt[] two constructions of a phrase that was not used consistently throughout the specification" when in actuality the claim term in question was a means-plus-function element and the Federal Circuit stated that there were two different functions claimed thus it required two separate constructions.[2] (Epic Tech's Brief at 10.)

## II.   DISPUTED CLAIM TERMS

### A. Play/Play a Game/Play of the Game/ Play of the Second Game – Indefinite.

Epic Tech incorrectly attempts to combine the analysis of "play," "play a game" and "play of the game," but inexplicably distinguishes this analysis from the analysis of "play of the second game." (Epic Tech's Brief at 8, 20.) Epic Tech's analysis also ignores Pen-Tech's primary assertion that these terms are indefinite and instead focusses solely on the fallback assertion proposed by Pen-Tech in the unlikely event that the Court requires a construction. Each of these 4 terms is indefinite for the common reason that they each employ the indefinite term "play," as evidenced by Pen-Tech's Opening Claim Construction Brief ("Pen-Tech's

---

[2] "When the claim itself is considered in its entirety, it becomes clear that the call cost register means has two separate and equally important functions…Both functions are claimed explicitly in the '463 patent, and both are significant for construction." *Phonometrics, Inc.* 133 F.3d 1459, 1465-1466

Brief"), but as illustrated in Pen-Tech's Brief they are also indefinite for distinct reasons.

For each of these terms, Epic Tech incorrectly asserts that they should be afforded their "plain and ordinary meaning" and that a POSITA would recognize what that meaning was. (*Id.* at 9, 21.) However, Epic Tech's own brief confirms Pen-Tech's assertion that these terms are used inconsistently within the claims and thus are indefinite.

1. Play – Indefinite.

Epic Tech admits in its Brief that the term "play" is used inconsistently within the same claim: "The term 'play' is used in the Patent to indicate a time period while a game is occurring or being played…[t]he first use of 'play' in this sentence implies a period of time while the game is being played…[t]he second use of 'play' in the same sentence means the act of playing the game from its start to finish…" (Epic Tech's Brief at 9.) It even attempts to argue that it is legally permissible by misquoting case law (as explained in Section I above). This inconsistent use alone is sufficient to render the term "play" indefinite. (Declaration of Stacy Friedman dated February 18, 2022 at ¶¶ 53-61 ("Friedman Dec.", a true and correct copy of which is attached as Exhibit 4 to Pen-Tech's Brief.) However, as indicated in Pen-Tech's Brief, the term "play" appears many

more times and is used inconsistently throughout both independent claims of the '317 Patent (Claims 1, 18.)

Epic Tech admits that there are multiple different possible meanings for the term "play" within each claim, which is contrary to the caselaw. *See Aventis Pharm. Inc.* 715 F.3d at 1374. None of the different meanings is appropriate for every use and thus the term is indefinite. *Media Rights Techs., Inc. v. Capital One Financial Corp.,* 800 F.3d 1366, 1371 (Fed. Cir. 2015). Epic Tech's proposal of "plain and ordinary meaning" does nothing to resolve this issue and should be rejected.

2. Play a Game – Indefinite.

Epic Tech cites to a single location in the specification to assert that the term "play a game" means "a duration of time of the occurrence of the game," but ignores the various inconsistent uses within the claim itself. (Epic Tech's Brief at 10.) As indicated in Pen-Tech's Brief, Claim 1 utilizes the term "play a game" differently in the preamble, and in section a. Claim 18 utilizes this term in section b.i. The multiple different uses of this term within the claims and the specification (*e.g.,* '317 Patent at 7:8-11, 3:45-51, and 12:33-39) combined with the fact that the specification makes it impossible to determine which game is being played render

this term indefinite.  (Friedman Dec. at ¶63.)  Epic Tech's proposal of "plain and ordinary meaning" does nothing to resolve this issue and should be rejected.

3.  Play of a Game/Play of the Second Game – Indefinite.

Epic Tech further admits in its Brief that the term "play of a game/the second game" is used inconsistently throughout the patent: "'play [of] the game' encompasses the process of playing the entirety of the game, not just starting it… [i]n another example, the term 'play of the game' means finish, i.e., '[d]etermining whether the play of the second game results in a prize'" (Epic Tech's Brief at 11) (emphasis added) and "The term 'play of the second game' does not encompass the entirety of game play or any specific point in game play of the second game. (*Id.* at 20.) The Patent uses the term to refer to an ongoing active condition of the second game, not merely its start, completion, or the entirety of its operation." (Epic Tech's Brief at 20.) (emphasis added.)  Epic Tech's own constructions are in direct contradiction to each other.  If Epic Tech can't discern a consistent meaning for this term how is anyone else supposed to, including a POSITA?

Epic Tech admits that there are multiple inconsistent meanings for the term "play of a game/the second game" within each claim.  None of the different meanings is appropriate for every use and thus the terms are indefinite. *Media*

*Rights Techs., Inc.* 800 F.3d at 1371. Epic Tech's proposals of "plain and ordinary meaning" do nothing to resolve this issue and should be rejected.

**B. Bonus Time Period – Indefinite.**

Epic Tech's proposed construction finds no support in the plain claim language or in the specification, is contrary to the arguments made during the prosecution history is itself indefinite and should be rejected. As an initial matter, the words "separate from, what was expected" does not exist within the '317 Patent and Epic Tech does not assert that they are. More importantly, Epic Tech's proposed construction, which requires the time awarded to be "in addition to…what was expected" is itself indefinite. How is a potential infringer supposed to know what a player "expected?" Maybe the player "expected" the time awarded to be active the entire time the player played at the machine, or maybe the player "expected" that the size of the bet determined the length of time. Maybe the player was new to gambling and had one expectation then read the instructions and the player's expectations changed. There is no way to attach a definitive metric to what a player "expected" and as such Epic Tech's proposed construction would be indefinite and should be rejected.

Further, Epic Tech's citations to the specification merely recite the words "bonus time period" without providing any specific metes or bounds– even though

this is not a term of art in the gaming industry.  (Friedman Dec. at ¶75.)  The only information that is provided by the specification and the claims is vague and ambiguous.

It appears from the citations employed by Epic Tech that the bonus time period is a time period, that can be awarded.  It can be a fixed amount of time, or it can be an accumulated amount of time but either way it decrements in one second increments and it "is associated with eligibility to participate in the secondary game."  (Epic Tech's Brief at 13.)  However, in a March 4, 2013, amendment, the applicant, attempting to distinguish the claimed invention from the Gilmore Patent stated:

> The teaching of a bonus timer that makes a player aware that their eligibility to continue to play a bonus progressive game is about to end is neither a teaching nor suggestion of awarding a player a bonus time period…

(March 4, 2013, amendment at 8.)  Apparently, even Epic Tech cannot figure out what the "bonus time period" is.  Further, as analyzed in the Pen-Tech Brief, there is no way to reconcile the various logical inconsistencies created by the plain claim language (Friedman Dec. at ¶83) and thus "bonus time period" is indefinite. *Media Rights Techs., Inc.* 800 F.3d at 1371. The term "bonus time period" is indefinite and Epic Tech's proposed construction, which itself is indefinite, provides no further clarity.  Epic Tech's proposed construction should be rejected.

## C. Occurs/Occurred – Takes Place/Took Place.

Epic Tech sets forth no analysis for this term other than to state that it requires no construction and that Pen Tech's proposed construction is a synonym. However, as stated in Pen-Tech's Brief, there are certain boundaries that require guidance from the Court such as whether or not this term can mean trigger since the claim language specifically distinguishes this language. Accordingly, Epic Tech's proposal should be rejected.

## D. Particular Point in Time – Indefinite.

Epic Tech's proposed construction of "a specific individual moment or instance of time" is merely one of at least two conflicting constructions supported by the plain language of the claims. (*See e.g.,* Pen-Tech's Brief at 18-19.) Claim 1 also recites "a server conducts <u>all</u> play of the second game…<u>until</u> play of the second game is terminated" (emphasis added), which contradicts Epic Tech's assertions that "play of the second game" is merely the finish (Epic Tech's Brief at 11) and that the "particular point in time," which is when "play of the second game occurs," is just an instant. Further, Epic Tech's assertion that the "particular point in time" is "a moment in time that can occur within a time period running from start of the second game to end of the second game" (Epic Tech's Brief at 15), is contrary to the disclosure in the specification that "the player must maintain at least

one spin within the preconfigured eligibility timer 302 or they will become ineligible for the secondary game….ineligible players cannot win a prize from the secondary game if the secondary game triggers while they are ineligible." (10:44 - 63). Based on Epic Tech's assertion, a player may be eligible when the second game triggers, but the bonus time period may expire thereafter but before the "particular point in time," which would then make the eligible player ineligible to win a prize, which would be a nonsensical result.

Finally, Claim 1 recites "determining if the bonus time period <u>runs coincident with</u> the particular point in time" (emphasis added.) The use of "runs coincident with" implies an ongoing action performed by both elements together whereas if the applicant intended an instant in time it would have recited "was active at" or "was not expired at" which would imply an instant of time. The unresolvable inconsistency within the claim language, which is fully analyzed within Pen-tech's Brief, makes Epic Tech's proposed construction incomplete and incorrect and it should be rejected.

### E. Coincident With – Sharing a Common Time With.

Epic Tech's Brief is devoid of any argument supporting it assertion of plain and ordinary meaning. It offers no insight into what plain and ordinary meaning would be and as such its proposal should be rejected out of hand.

**F. The First Game/Playing the First Game – Indefinite.**

Epic Tech proposes plain and ordinary meaning for these terms and then asserts that the patent specifically defines the first game as a game that "can be played multiple times as long as the player continues to play the first game…[t]the patent uses the term 'first game' to distinguish between the game initiated at the gaming terminal and the 'secondary game'…which is played in the background." (Epic Tech's Brief at 19.)  However, Epic Tech fails to explain what "the first game" means or how it differs from the "game" in element 1.a.  If a player plays 2 games of Bingo, then switches to Keno for a game, then switches to Poker for the remaining games - are they all the first game, is Bingo the only first game or is the combination of the first 2 Bingo games the first game? (Col. 12:33 – 39.)  What if the player does not start a subsequent instance of a game quickly enough to remain eligible for the secondary game?  Is that subsequent game still the first game?  Is the time between instances of the game considered part of the first game or just the actual game play?  Neither the '317 Patent nor Epic Tech's analysis provides answers to these questions.  (Friedman Dec. at ¶¶98-101.)  Epic Tech's proposal therefore should be rejected.

### G. Triggered to Play – Set to Begin.

Epic Tech again incorrectly proposes plain and ordinary meaning for this

term.  Epic Tech asserts: "there is no period where [the second game] is 'set to

begin'…[r]ather the second game is either playing or not playing at any given

time."  (Epic Tech's Brief at 21.)  However, this assertion is belied by the

specification of the '317 Patent which discloses:

> Referring to FIG. 6C, the secondary display 190 is shown displaying a
> notice 326 that indicates to all of the players that play of the secondary
> game has been triggered. In various embodiments, the notice is a
> countdown timer that indicates the number of seconds until the reels on
> the secondary display 55 is spun to display the results. (11:50-56.)

Thus, when the second game is "triggered to play" there is a time before the reels

begin to spin.  Thus, "triggered to play" must mean that the second game is "set to

begin" when the countdown timer reaches zero.  Epic Tech's proposed

construction of "triggered to play" should be rejected as contrary to the intrinsic

record.

### H. Without Input from the Player – Indefinite.

According to Epic Tech, the term "without input from the player" should be

afforded its plain and ordinary meaning, which according to Epic Tech means that

the second game is fully controlled by a server and not by a player. (Epic Tech's

Brief at 22-23.) However, the phrase "without input" is not recited anywhere in the '317 Patent except in Claim 1 where it was added by amendment on May 9, 2013.

Epic Tech cites to various portions of the specification which state that the secondary game is played in the background, simultaneously with the play of the first game, on a server which "selects an electronic ticket from a fixed number of electronic tickets associated with the sweepstakes game for the secondary game." (Epic Tech's Brief at 22-23.) However, none of this disclosure teaches that this is done without input from the player. In fact, Epic Tech ignores the disclosure of the '317 Patent that the secondary game can be "any Class II or Class III games" (3:1-2), that the player can see the secondary game being played (Fig. 6D), that "[i]n various embodiments, the secondary game server 130 follows a similar procedure as the game terminals 140, 170 in choosing the reel display that corresponds to the result" (11:63-65), and that in a conventional casino slot machine game a player can manually stop the reels from spinning. (Friedman Dec. at ¶114.) If the secondary server follows a similar procedure as the game terminals, then it would allow a player to manually stop the reels from spinning during the second game – which is in direct contrast to the added claim language. It is also unclear from the intrinsic evidence whether "without input from the player" means that the player cannot play the standard game while the second game is being played, or that the

player's input does not affect the second game or that the player does not have the ability to provide input to the second game. Thus, Epic Tech's proposed construction of plain and ordinary meaning is not helpful and should be rejected.

## I. Receiving Requests from a Plurality of Players to Play a Game – Indefinite.

Epic Tech proposes plain and ordinary meaning for this term, which according to Epic Tech means that the requests are received by multiple terminals respectively. (Epic Tech's Brief at 23 - 24.) In its analysis of the term, Epic Tech ignores the plain language of the claim and instead relies on citations to the specification which disclose embodiments where multiple players are playing games on multiple terminals respectively. However, Claim 7, which recites this language as the only claim element, depends on Claim 1, which recites "[a] computer-implemented method of allowing a user to play an electronic game on a terminal…receiving a request from a player to play a game at a terminal." Thus, the term "receiving requests from a plurality of players to play a game" must refer to the "a terminal" of claim 1 or the claim language would also need to include requests to play a game "on a plurality of terminals respectively." Regardless of whether additional embodiments are disclosed in the specification, those embodiments are not covered by Claim 7. Instead Claim 7 requires the same terminal to further receive a plurality of requests. As discussed in Pen-Tech's

Brief, this term is indefinite and thus Epic Tech's proposed plain and ordinary meaning construction should be rejected.

### J.  At Least One Processor - One or More Processors Working Together.

Epic Tech again proposes plain and ordinary meaning for this term.  Although Epic Tech agrees that the term "at least one" means one or more, (Epic Tech's Brief at 25) it disagrees that these one or more processors must work together. Instead, Epic Tech argues that this term "ha[s] nothing to do with the way the processor or processors operate or work…"  (*Id.* at 25.)  However, Claim 18, which includes this claim term, defines the "at least on processor" in terms of its function (wherein the at least one processor is configured to: perform numbered steps (i. – vi.).) Thus, contrary to Epic Tech's incorrect assertion, the way the processor or processors operate, or work is entirely relevant.  In fact, as discussed in further detail in Pen-Tech's Brief, when the "at least one processor" includes multiple processors, the processors must be working together, or the claim becomes indefinite (*e.g.,* it becomes impossible to discern if all processors will perform individual steps or if they will each perform all steps or if some will perform all steps and others will perform some steps).  Accordingly, Epic Tech's proposed claim construction should be rejected, and Pen-Tech's construction adopted.

## III.    CONCLUSION

Epic Tech's Proposed claim constructions are contrary to the law and/or the facts and should be rejected.  The claim constructions Pen-Tech proposes are faithful to the intrinsic evidence and should be adopted.

This 9th day of March 2022.

FISHERBROYLES, LLP

/s/ Richard Lehrer_____
RICHARD LEHRER
(admitted *pro hac vice*)
richard.lehrer@fisherbroyles.com
109 Normandy Drive
Woodstock, GA 30188
Tel: 845-519-9525

VINCENT BUSHNELL
Georgia Bar No. 098999
vincent.bushnell@fisherbroyles.com
945 East Paces Ferry Rd. NE
Suite 2000
Atlanta, Georgia 30326
Tel: 678-902-7190
*Attorneys for Defendant/Counterclaim*
*Plaintiff Pen-Tech Associates, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing PEN-TECH ASSOCIATES, INC.'S

BRIEF IN RESPONSE TO EPIC TECH'S OPENING CLAIM CONSTRUCTION

BRIEF has been prepared in 14-point Times New Roman font and complies with

LR 5.1, NDGa and LR 7.1(D), NDGa.

/s/ Richard Lehrer
Richard Lehrer
admitted *pro hac vice*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EPIC TECH, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | CASE NO. 1:20-cv-02428-MHC |
| v. | ) | |
| | ) | |
| PEN-TECH ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2022, I caused the foregoing document

(PEN-TECH ASSOCIATES, INC.'S BRIEF IN RESPONSE TO EPIC TECH'S

OPENING CLAIM CONSTRUCTION BRIEF) to be filed with the Clerk of Court

using the CM/ECF system, which automatically will send an electronic mail

notification to the following attorneys of record:

L. Clint Crosby
ccrosby@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell
& Berkowitz, PC


/s/ Richard Lehrer
Richard Lehrer
admitted *pro hac vice*