## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

EPIC TECH, LLC, )
)
Plaintiff/Counterclaim Defendant, )
)
v. ) CIVIL ACTION NO.
) 1:20-cv-02428-MHC
PEN-TECH ASSOCIATES, INC., )
)
Defendant/Counterclaim Plaintiff. )
_____ )

## PLAINTIFF EPIC TECH, LLC'S RESPONSIVE CLAIM CONSTRUCTION
## BRIEF REGARDING U.S. PATENT NO. 8,545,317

# **Table of Contents**

Table of Authorities ............................................................................................ ii

Table of Exhibits ............................................................................................... iii

Introduction ....................................................................................................... 1

I.     The Terms of the '317 Patent are Not Indefinite ............................................ 3

Legal Standard .................................................................................................. 3

    a.   "play" / "play a game" ........................................................................ 4

    b.   "play of a game" / "play of the second game" ................................... 8

    c.   "bonus time period" ........................................................................... 9

    d.   "particular point in time" ................................................................. 12

    e.   "the first game" / "playing the first game" ..................................... 15

    f.   "without input from the player" ....................................................... 17

    g.   "receiving requests from a plurality of players to play a game" ..... 20

II.    Defendant's Proposed Term Constructions are Unnecessary When the Plain and Ordinary Meaning of the Terms are Sufficient and Appropriate. ................................................................................................. 22

    a.   "occurs" / "occurred" ...................................................................... 23

    b.   "coincident with" ............................................................................. 23

    c.   "triggered to play" .......................................................................... 24

    d.   "at least one processor" ................................................................... 24

Conclusion ....................................................................................................... 24

# Table of Authorities

Cases                                                    Page

*Advanced Media Networks, LLC v. AT&T Mobility LLC*,
748 F. App'x 308 (Fed. Cir. 2018) .................................................................. 2, 22

*CSB-System Int'l, Inc. v. SAP America, Inc.*,
2011 WL 3240838 & n.16 (E.D. Pa. July 28, 2011) ........................................... 4

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
672 F.3d 1270 (Fed. Cir. 2012) ........................................................................ 22

*Gilead Sciences, Inc. v. Mylan Inc.*,
2015 WL 1534067 (N.D.W.V. Apr. 6, 2015) ...................................................... 4

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) (overruled on other grounds ............................ 2

*In re Packard*,
751 F.3d 1307 (Fed. Cir 2014) .......................................................................... 3

*Intel Corp. v. VIA Techs., Inc.*,
319 F.3d 1357 (Fed. Cir. 2003) ......................................................................... 3

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
336 F.3d 1308 (Fed. Cir. 2003) ......................................................................... 5

*Inverness Med. Switzerland GmbH v. Warner Lambert Co.*,
309 F.3d 1373 (Fed. Cir. 2002) ......................................................................... 5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014) ................................................................................... 2, 3

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001) ......................................................................... 5

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ...................................................................... 1, 2

Statutes

U.S.C. 35 § 112(b) ............................................................................................. 3

## Table of Exhibits

Exhibit 1 - United States Patent No. U.S. 8,545,317

Exhibit 2 – Declaration of Ivan Zatkovich

Pursuant to Patent L.R. 6.5, Epic Tech, LLC ("Plaintiff" or "Epic Tech") submits its Responsive Claim Construction Brief as to particular terms of U.S. Patent No. 8,545,317 (the "'317 Patent" or the "Patent", attached as Exhibit 1).[1]

## <u>INTRODUCTION</u>

Pen-Tech Associates, Inc.'s ("Pen-Tech" or "Defendant") Opening Claim Construction Brief (ECF. No. 46; "Def. Brief") offers four proposed constructions for particular claim terms of the '317 Patent and asserts that ten additional terms are indefinite. In the parties' Joint Claim Construction Statement (ECF No. 42), Pen-Tech made the same indefiniteness arguments, but offered proposed constructions for twelve of fourteen claim terms. Pen-Tech appears to now be doubling down on its indefiniteness claims, but as demonstrated herein, the claim terms of the '317 Patent are well understood by a person of ordinary skill in the art ("POSITA") and Pen-Tech's indefiniteness arguments fail. Pen-Tech's proposed constructions and unfounded arguments of indefiniteness should be rejected as all the disputed terms can plainly be understood from the intrinsic record. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). It is unnecessary to construe claim terms

---

[1] All citations to the specification of the Patent-in-Suit refer to the column and line number of the patent in the following formats (Col. A):(line Y)-(line Z) or (Col. A):(line Y) - (Col. B):(line Z).

when the language is simply understood through its ordinary and customary meaning. *Id.* This is particularly true when the terms are used in accordance with their plain meaning within the intrinsic record, and when there has been no statement that rises to the level of a disclaimer or disavowal of claim scope in the intrinsic record. *Advanced Media Networks, LLC v. AT&T Mobility LLC*, 748 F. App'x 308, 311 (Fed. Cir. 2018). In such situations, the plain and ordinary meaning applies. *Id.*

Further, a claim is only indefinite if it fails to give a person of ordinary skill in the art reasonable certainty as to its meaning. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "Of course, claims are not indefinite merely because they present a difficult task of claim construction." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (overruled on other grounds). Under this guidance, Pen-Tech's claims of indefiniteness cannot be sustained.

In sum, the vast majority of the disputed claim terms in the Patent are straightforward, and their plain and ordinary meaning would be apparent, if not obvious, to any POSITA and any juror. For those few terms which would benefit from construction, Epic Tech has proposed logical constructions in accordance with the intrinsic evidence.

# I.     The Terms of the '317 Patent are Not Indefinite

## Legal Standard

A patent's claims, viewed in light of the specification and prosecution history, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). The requirements of U.S.C. 35 § 112(b) do not mandate "unreasonable precision" in the drafting of the claims. *In re Packard*, 751 F.3d 1307, 1313 (Fed. Cir 2014). Some ambiguity is to be expected because "absolute precision is unattainable." *Nautilus, Inc.*, 134 S. Ct. at 2129. The standard adopted by the Supreme Court "accords with opinions of [the] Court stating that the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id*. (internal citation omitted). Further, "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003).

Here, Pen-Tech alleges that several terms in the '317 Patent are indefinite because Pen-Tech believes the terms can have varying meanings. However, it is not the case that a term is indefinite if it may have more than one construction. The test is whether a POSITA would understand the construction and use of the term within the Patent. *Nautilus, Inc.* 134 S. Ct. at 2129.

Moreover, courts have held that "the weight of the jurisprudence disfavors indefiniteness determinations at the *Markman* stage of patent litigation." *Gilead Sciences, Inc. v. Mylan Inc.*, 2015 WL 1534067, at *2 (N.D.W.V. Apr. 6, 2015) (quoting *CSB-System Int'l, Inc. v. SAP America, Inc.*, 2011 WL 3240838, at *17, 20 & n.16 (E.D. Pa. July 28, 2011)). "Several principles mitigate against ruling on indefiniteness at the *Markman* stage: first, the high burden of proof on the party challenging a patent claim for indefiniteness; second, the fact that a claim is not indefinite merely because the parties dispute its meaning; and, finally, the dispositive effect of a ruling on indefiniteness, which invalidates the claim entirely." *Id.* Accordingly, Pen-Tech's indefiniteness arguments should not be sustained, and particularly at this stage, for the reasons set forth below. In contrast, Epic Tech does not seek to define terms which need no construction beyond "plain and ordinary."

### a. "play" / "play a game"

Pen-Tech asserts that using the term "play" as both a verb and a noun within the '317 Patent makes this term indefinite. This is not correct. The noun "play" and the verb "to play" are understood by a POSITA to have particular function within the '317 Patent. *See* Declaration of Ivan Zatkovich, attached as Exhibit 2 ("Zatkovich Dec.") and fully incorporated into this brief by reference. Zatkovich Dec. at ¶¶17-18, 21. Pen-Tech has bootstrapped its indefiniteness assertions as to

these terms by conflating the noun and verb and adding limitations to the term with proposed constructions of other terms, thus creating incorrect and conflicting meanings that give rise to Pen-Tech's indefiniteness arguments.

The Federal Circuit has found that a term can have multiple meanings within a patent. *See Inverness Med. Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1382 (Fed. Cir. 2002) (holding that "a word that has an ordinary meaning encompassing two relevant alternatives may be construed to encompass both alternatives" unless the intrinsic evidence "clearly demonstrates that only one of the multiple meanings was intended."); *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) (holding that the claim term "portion" may be interpreted in accordance with the dictionary definitions to encompass both "separate" and "integral" parts of an object).

Ultimately, findings of indefiniteness are disfavored, and close questions of indefiniteness are to be resolved in favor of the patentee. *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

As a noun, the concept of "play of the game" refers to all of the elements or aspects that go into performing the game. Thus, phrases such as "facilitating play of the game at the terminal" are well understood by a POSITA. Zatkovich Dec. at

¶18. "Play" in its noun form pertains to a method that allows the performance of those elements or makes it easier to perform those elements. As a verb, "to play" or "playing" refers to a method that the user must perform on a gaming terminal to have the game begin, proceed through steps and provide a result. Zatkovich Dec. at ¶21. The word "play", in both forms, is a clear term that is understood by a POSITA and accordingly, no construction of the term is needed beyond its plain and ordinary meaning.

Pen-Tech makes the false assumption that it is necessary to know whether the method is facilitating a particular part of the game or the entire game:

> In this claim, the term appears to be used to mean to begin the game – "receive a request…to play a game" … The term also is used to indicate the entire game from start to finish, a portion of the game, or possibly a single moment of the game depending on the construction of the associated terms. … As illustrated from the above there are multiple different possible meanings for the term "play" within each claim, none of which is appropriate for every use Friedman Dec. at ¶61 and thus the term is indefinite.

Def. Brief at 9. However, there are no limitations of the claim that require this information. The method of performing the game applies to any, or all, of the "play of the game" (any or all of the elements for performing the game). Zatkovich Dec. at ¶20. Further, Pen-Tech's argument inappropriately adds words surrounding the term "play" into its construction. For example, "receive a request from a player to play a game at the terminal;" Claim 1(a), implies the start of a game when read as a

whole, but the context does not impact the construction of the verb "play" as a term in the claim. Rather, it is the new request that is received which indicates a commencement, not the term "play" itself, which has its plain and ordinary meaning in the claim. Zatkovich Dec. at ¶21.

Pen-Tech asserts that the use of "play" as a verb "appears in claim 1 to be used to mean to begin the game" or "to mean the game is set to begin". Def. Brief at 7-8. However, playing a game or requesting to play a game refers to performing steps to start, participate in, and complete a game with some result. Playing a game could be performed through a single action or multiple actions. Zatkovich Dec. at ¶24. A single action performed by a player could lead to additional actions taken by the player or by a gaming system. Pen-Tech is importing a limitation to the term "play" or "play a game" that is not a requirement of the '317 Patent. The '317 Patent specifically refers to what must be performed to "play a game" and actions that are taken to show the results of that game. Zatkovich Dec. at ¶25.

FIG. 2 depicts an exemplary **method for playing a game on a terminal 140, 170** … when, for example, one or more **players press or activate a spin or reveal button** 306 (FIG. 5) on the gaming terminals 140, 170. '317 Patent 6:49-53

**When the player presses the reveal button** 306, the game terminal 140, 170 send the request to the game server 120, the game server pulls a play from a fixed number of electronic sweepstakes tickets and returns a result of the ticket to the game terminal 140, 170. The game terminal

> 140, 170 evaluates the received result and initiates a reel spin to display a combination of symbols on screen 300 that corresponds to the result received from the game server 120. '317 Patent 10:64-67-11:1-4

Therefore, the verb form of "play" indicates action a player must perform on a gaming terminal to have the game begin, proceed through steps and provide a result. It does not just explain what must be performed to "begin" or "set to begin" a game. Zatkovich Dec. at ¶26. The terms "play" and "play a game" are well understood by a POSITA within the context of the '317 Patent and are not indefinite.

**b.** **"play of a game" / "play of the second game"**

Pen-Tech asserts that the terms "play of a game" and "play of the second game" are indefinite because of their association with the term "play", thereby bootstrapping indefiniteness arguments together by relying on Defendant's own flawed construction of another term for its indefiniteness argument. In addition, Pen-Tech asserts that the multiple uses of these terms in the claims would not be understood by a POSITA. This is incorrect. As stated above the term "play" is not indefinite. A POSITA would be able to determine the meaning of these terms, as well as the term "play" by their usage in the claims. Zatkovich Dec. at ¶31.

"Play of a game" is used in the Patent claims and specification to make clear to the reader that the reference is to a game being played on an individual gaming terminal and not the secondary game that is being played in the background (by a

secondary gaming server). The term "play of a game" appears in the context of "playing a game on the gaming terminal" when necessary to distinguish from the secondary game in the specification or claim. Zatkovich Dec. at ¶35. This can be seen in Claim 1 which references both the first and second games and provides such a distinction.

> 1. A computer-implemented method of allowing a user to play an electronic game on a terminal, said method comprising:
>
> a. receiving a request from a player to **play a game at a terminal**;
>
> b. at least partially in response to receiving the request, facilitating **play of the game at the terminal**;
>
> c. at least partially in response to receiving the request from the player, establishing a bonus time period for the player;
>
> d. receiving an indication that **play of a second game occurs** at a particular point in time;

'317 Patent 12:42-53.

"Play of the second game" is the counterpart to "play of a game" in that it refers to the game which is played in the background. Both terms are easily understood by a POSITA in the context of the '317 Patent. Zatkovich Dec. at ¶37.

**c.** **"bonus time period"**

The bonus time period feature of the '317 Patent is what enables a player to be eligible to participate in the separate secondary game run on the background secondary game server. The '317 Patent is clear on the definition of the "bonus time

period", when it is awarded, and how it is updated. Zatkovich Dec. at ¶42. Epic Tech proposes bonus time period be construed as "a duration of time awarded to a player in addition to, and separate from, what was expected or previously established". Pen-Tech, however, alleges the term is indefinite and conflates the "bonus time period" with other countdown timers and how the bonus time period relates to the play of the secondary game. To the contrary, these various embodiments as to how the bonus time period is incremented or decremented do not create an indefinite term or claim. Zatkovich Dec. at ¶46.

The '317 Patent teaches various embodiments of the invention and the "bonus time period." A "bonus time period" can be manipulated or changed; it can be increased or accumulated; it can be decremented or counted down. Zatkovich Dec. at ¶44. For example, "the **bonus time period decrements** in one second increments whether the **bonus time period is a fixed amount or accumulates** as the player continues to play the game." '317 Patent 7:21-24.

Accordingly, there are no absolute values or limits as to what the duration of a "bonus time period" can or must be. Zatkovich Dec. at ¶45. Absolute values or limits are not necessary since there are no absolute calculations or determinations needed for the "bonus time period". Calculations for time periods such as this bonus

time period occur regularly in software programs and the operations described in the

'317 Patent are clear and unambiguous to a POSITA. Zatkovich Dec. at ¶44.

> In some embodiments, the **bonus time period** may be a predetermined
> amount of time, for example, fifteen seconds of eligibility … In various
> other embodiments, the **bonus time period** may be five seconds of
> eligibility time, and the eligibility time may accumulate each time the
> player submits a request to play the game at terminal 140, 170.

'317 Patent, 7:4-14. Even when the "bonus time period" is adjusted or changed, at

any given time, the bonus time period is always a fixed value. When it is established,

it is a fixed value. When it is incremented or decremented it is a fixed value.

Zatkovich Dec. at ¶46. Once "bonus time period" is established or awarded there is

no point in time within the system where the "bonus time period" is unfixed,

unknown, unclear, or ambiguous.

Pen-Tech asserts that there is confusion over the "bonus time period" and a

criterion to earn a "bonus time period"; specifically, the support Pen-Tech cites

refers to a period of time in which the user must request to play the game and thus

earn the bonus time period. Zatkovich Dec. at ¶49. Any confusion is created by

Pen-Tech. This period of time between requests to play the game are not the same

as the "bonus time period". The specification and claims define the "bonus time

period" as an indication of eligibility of the player to participate in the second game.

A POSITA reviewing the Patent would understand both the meaning of the term and

the scope of the claims based on construction of the term "bonus time period" as "a duration of time awarded to a player in addition to, and separate from, what was expected or previously established". Zatkovich Dec. at ¶66.

Pen-Tech also argues that the Patent Examiner, in its Notice of Allowance "allowed the claims based on a specific aspect of the term . . ." Def. Brief at 14. The Defendant is misinterpreting this statement by the examiner; it is not a limitation of the claim terms. Each of the claims were allowed as originally documented because the examiner indicates that "regarding independent Claim 1, none of the cited prior art discloses or teaches a method which, in combination with other remaining claimed elements" does what is claimed in claim 1. Zatkovich Dec. at ¶61. The '317 Patent makes it very clear that the secondary game must begin during a player's bonus time period in order for that player to participate in the secondary game, but it need not be completed during the player's bonus time period. Zatkovich Dec. at ¶64. Pen-Tech's arguments arising from the prosecution history do not change or limit the claim terms.

### d.    "particular point in time"

The claim term "particular point in time" is clear and unambiguous to a POSITA within the context of the '317 Patent. Epic Tech proposes "particular point in time" be construed as "a specific individual moment or instance of time." The use

of the word "point" alone indicates that the term refers to an instance or moment in time, and not a duration of time as asserted by Pen-Tech. Zatkovich Dec. at ¶70. The '317 Patent uses "particular point in time" to determine defined eligibility criteria to potentially award a prize to the player(s) participating in the secondary game. Figure 3 of the Patent illustrates the criteria which must occur at a "particular point in time" in order to determine eligibility:

1) the bonus time period for the player is operative, Patent, Fig. 3:238; and
2) the secondary game occurs, Patent, Fig. 3:236

That the player has an operative bonus time period is the first criteria that must be met for a player to be eligible to participate in the secondary game. The "particular point in time" that the secondary game is triggered is then compared with the player's bonus time period to see if it is active at the particular point in time. Zatkovich Dec. at ¶¶70-72.

The language of claim 1 provides the conditions related to the "particular point in time" specifically setting forth when play of the secondary game occurs "receiving an indication that play of a second game occurs at a **particular point in time**;" Claim 1.d., and comparing that point in time to when the player's bonus time period is operative: determining if the **bonus time period** runs coincident with the **particular point in time**. Claim 1.e.

And once the secondary game is triggered to play at a "particular point in time", the play of the secondary game is conducted on the secondary game server. Zatkovich Dec. at ¶75.

The '317 Patent provides that multiple players may be eligible to participate in the secondary game based on their respective eligibility by having an active bonus time period. Zatkovich Dec. at ¶76. When the secondary game is triggered to play, the server determines which players are eligible and then performs the steps to play the game for the participating players. Zatkovich Dec. at ¶76. The Patent describes how the secondary game is played:

> Once play of the secondary game is triggered, the secondary game server selects an electronic ticket from a fixed number of electronic tickets associated with the sweepstakes game for the secondary game. Based on the selected electronic ticket, the secondary game server 130 determines the result associated with the electronic ticket and the corresponding symbols associated with the result.

'317 Patent 11:56-63. As understood by a POSITA, the secondary game play occurs on the secondary game server in nanoseconds, although the display of the secondary game may run beyond the particular point in time "to heighten the excitement and anticipation of the players." Zatkovich Dec. at ¶77.

It is the player's eligibility at the "particular point in time" that determines if the player can receive a prize or any portion thereof from the secondary game. '317 Patent, 9:2-5. The "particular point in time" is the moment when the secondary game

is triggered and the player's eligibility to participate in any resulting prize can be determined (by assessing if the player has an active bonus time period). Zatkovich Dec. at ¶¶79-80. Given the context of the '317 Patent, a POSITA would understand "particular point in time" to mean "a specific individual moment or instance of time." Zatkovich Dec. at ¶81.

e. **"the first game" / "playing the first game"**

"The first game" is used in the '317 Patent claims and specification to make clear that the reference is to the game being played on an individual gaming terminal and not the secondary game that is being played in the background (by a secondary gaming server). Zatkovich Dec. at ¶84. Pen-Tech alleges that the term "the first game" could mean several things, including a single instance of a particular game, multiple instances of the same game, or the first game in a list of potential games, thus making it indefinite. Contrary to Pen-Tech's argument, when referring to "the first game", the Patent is clear in referring to a game being played by a player on a gaming terminal. It does not matter what game is played on the gaming terminal, only that the game on the gaming terminal is distinguished from the secondary game being played simultaneously in the background on the secondary game server. Zatkovich Dec. at ¶85.

The term "the first game" only appears when referring to more than one game in a specification, passage, or claim for distinguishing from the secondary game. The '317 Patent refers to playing a game at a gaming terminal, instead of "the first game" when no other game is mentioned, because there is no need to distinguish the game on the gaming terminal and the secondary game on the server. However, once the secondary game is introduced, the term "the first game" is used to make the distinction between them. Zatkovich Dec. at ¶87. This is demonstrated in Claim 1 below:

1. A computer-implemented method of allowing a user to **play an electronic game on a terminal**, said method comprising:

a. receiving a request from a player to **play a game at a terminal**;

b. at least partially in response to receiving the request, facilitating **play of the game at the terminal**;

c. at least partially in response to receiving the request from the player, establishing a bonus time period for the player;

d. receiving an indication that **play of a second game occurs** at a particular point in time;

e. determining if the bonus time period runs coincident with the particular point in time;

f. determining, while **the player is playing the first game**, whether **play of the second game** results in a prize; and

g. if **play of the second game** results in a prize and the bonus time period runs coincident with the particular point in time, awarding at least a portion of the prize to the player, wherein **once the second game is triggered to play, a server conducts all play of the second game**

> without input from the player until **play of the second game** is
> terminated.

'317 Patent 12:42-64.  As with the term "the first game", the terms "playing the first

game" only appears when there are references to both games in a specification

passage or claim to make the distinction between playing the game on the gaming

terminal and play of the secondary game in the background on the secondary game

server.  These terms should be ascribed their plain and ordinary meaning.

### f.    "without input from the player"

The term "without input from the player" is easily understood by a layperson,

and certainly by a POSITA.  Pen-Tech cobbles together an indefiniteness argument

by stating the term could have multiple meanings: "the player cannot play the

standard game while the second game is being played, or that the player's input does

not affect the second game or that the player does not have the ability to provide

input to the second game." Def. Brief at 23.  Pen-Tech's argument is inconsistent

with the plain language of the term and its use within the '317 Patent and further

improperly adds a limitation to the claim.

When a game requires input from the player, a display is to be presented to

prompt the player to take some action using a keyboard, mouse, joystick, or other

input device attached to the game terminal and the user would have to take the action.

Zatkovich Dec. at ¶102.  Because the secondary game of the '317 Patent runs in the

17

background, ("once the second game is triggered to play, a server conducts all play of the second game without input from the player until play of the second game is terminated", '317 Patent, Claim 1.g), the server conducts all play of the secondary game. Further, the display of the results of the secondary game is on a secondary game screen which is separate from the display of the player's game on the gaming terminal. No input for the second game is requested or needed from player. Zatkovich Dec. at ¶102. This is disclosed in claim 1(g) of the Patent, which teaches, "wherein once the second game is triggered to play, a server conducts all play of the second game **without input from the player until** play of the second game is terminated." '317 Patent, 12:61-64.

The '317 Patent makes clear that the player playing a first game on the gaming terminal is not conducting any play of the secondary game, nor is the player interacting with the secondary game as it plays simultaneously in the background. "Once play of the secondary game is triggered, **the secondary game server selects an electronic ticket** … Based on the selected electronic ticket, **the secondary game server 130 determines the result** associated with the electronic ticket and the corresponding symbols associated with the result." '317 Patent, 11:56-63. Results of the secondary game are displayed on a separate terminal display(s) that are viewable by all participants. "**Actual play of the secondary game is carried out**

**by secondary game server** 130, and the results are **displayed on the secondary game display** 190, which is **viewable** by all participants." '317 Patent, 12:4-11.

Pen-Tech's expert misconstrues the '317 Patent's description of a possible embodiment where a display is selected by the secondary game server. "In various embodiments, the secondary game server 130 follows a similar procedure as the game terminals 140, 170 in choosing the reel display that corresponds to the result" '317 Patent, 11:63-65. Pen-Tech's expert notes that "in conventional casino games a player can manually stop the reels from spinning." Def. Brief at 23 citing Friedman Dec. at ¶114. And Defendant goes on to argue that "[i]f the secondary server follows a similar procedure as the game terminals, then it would allow a player to manually stop the reels from spinning during the second game." Def. Brief at 23. But the Patent does not say that the secondary game server follows the exact same procedures as "conventional casino games" nor does it say that the similarity between the procedure of the secondary game server and the procedure of game terminals 140 and 170 extends beyond "choosing the reel display that corresponds to the result." '317 Patent, 11:65-66.

The process which Pen-Tech claims is typical of conventional casino games, whereby a player can manually stop the reels from spinning, is the act of determining the result, not displaying the result. Having a secondary game display where results

of a secondary game are viewable by all participants, does not indicate that players may influence the results or interact with the secondary game.  Zatkovich Dec. at 107.  The '317 Patent makes it clear to a POSITA that the secondary game plays in the background, independent of any action from the player.  Zatkovich Dec. at ¶87.  Further, Defendant's requirement that a player be allowed to selectively stop the play of the secondary game is an improper additional limitation not supported by the specification nor claims of the '317 Patent.

There can only be one meaning for the term "without input from the player" in the '317 Patent and the term is understood by applying its plain and ordinary meaning.

### g. **"receiving requests from a plurality of players to play a game"**

Pen-Tech asserts that this term is indefinite because "play" is indefinite (addressed above), because the word "game" is used multiple times within the claim, and because the use of the antecedent "a" in this term allegedly means a single terminal would "receive requests from multiple players to simultaneously play different games on the same terminal".  This construction does not meet the intent of the '317 Patent or correspond with the Patent's drawings which show multiple terminals connected to a network and incorporates another improper unsupported

limitation by Defendant.  As with its other assemblage interpretations, Pen-Tech asserts that this term is indefinite because the term "play" is indefinite.

The abstract of the '317 Patent defines a secondary game system comprised of a system of networked game terminals:

> A secondary game system, in various embodiments, comprises a **system of networked game terminals where a player playing a game on a game terminal** can earn eligibility to win a prize from a secondary game that plays simultaneously in the background.  The secondary game may be triggered based on **play on the plurality of networked terminals**.

'317 Patent, Abstract.  This language shows the intent of the system is to have a plurality of players playing games on a plurality of game terminals.  A POSITA, at any time, would understand that multiple players playing multiple games on a single game terminal at the same time would not meet the intent of the '317 Patent because it ignores the fact that there are multiple gaming terminals which are intended to be used by multiple players.  Zatkovich Dec. at ¶117.  It makes no sense for two players to play respective games on one gaming terminal.

Additionally, Figure 4 illustrates the interaction between two players at two gaming terminals.  At step 252, a player requests to play a game "at one of a plurality of terminals".  Then at step 256, a second player requests to play a game "at another one of the plurality of terminals".  Each player is requesting to play a game at one of the gaming terminals, not at another player's gaming terminal.  To construe this

term to mean that multiple players are using one terminal is completely contrary to the Patent's claims and specification.  Zatkovich Dec. at ¶120.

Pen-Tech's proposed construction is a convoluted way to interpret a simple phrase inconsistently with the Patent.  The term is not ambiguous or indefinite and its plain and ordinary meaning properly should apply.

## II. Defendant's Proposed Term Constructions are Unnecessary When the Plain and Ordinary Meaning of the Terms are Sufficient and Appropriate.

Pen-Tech proposes constructions for four terms which need no construction: "occurs" / "occurred"; "coincident with"; "triggered to play"; and "at least one processor".  There is no basis for construing the terms that are well understood by a POSITA within the context of the intrinsic evidence.  "Our case law is clear that a claim term should be accorded the full breadth of its plain and ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1280 (Fed. Cir. 2012).  Indeed, "there is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time." *Advanced Media Networks, LLC v. AT&T Mobility LLC*, 748 F. Appx. 308, 311 (Fed. Cir. 2018) (internal quotations omitted).  No construction is necessary to aid the Court or the jury in understanding these terms

and the true scope of the claims. Epic Tech proposes that the plain and ordinary meaning should apply to these four terms, not the litigation-driven constructions proposed by Pen-Tech.

### a. **"occurs" / "occurred"**

Pen-Tech proposes "takes place" / "took place" when nothing beyond the terms plain and ordinary meaning is needed for a POSITA to understand the terms within the Patent. The plain and ordinary meaning of the term "occurs" / "occurred" does not require construction for understanding by a POSITA. Epic Tech fully incorporates its construction argument from Plaintiff's Opening Claim Construction brief herein.

### b. **"coincident with"**

Pen-Tech proposes "sharing a common time with", but actually, nothing beyond the term's plain and ordinary meaning is needed for a POSITA to understand the term within the Patent. The plain and ordinary meaning of the term "coincident with" does not require construction for understanding by a POSITA. Epic Tech fully incorporates its construction argument from Plaintiff's Opening Claim Construction brief herein.

### c. **"triggered to play"**

Pen-Tech proposes the construction "set to begin", but again, nothing beyond the term's plain and ordinary meaning is needed for a POSITA to understand the term within the Patent. The plain and ordinary meaning of the term "triggered to play" does not require construction for understanding by a POSITA. Epic Tech fully incorporates its construction argument from Plaintiff's Opening Claim Construction brief herein.

### d. **"at least one processor"**

Pen-Tech proposes the construction "one or more processors working together" but nothing beyond the term's plain and ordinary meaning is needed for a POSITA to understand the term within the Patent. The plain and ordinary meaning of the term "at least one processor" does not require construction for understanding by a POSITA. Epic Tech fully incorporates its construction argument from Plaintiff's Opening Claim Construction brief herein.

## CONCLUSION

Despite Pen-Tech's contrived arguments, the claim terms of the '317 are not indefinite and almost all the terms in dispute do not require construction in order to be understood by a POSITA within the context of the '317 Patent. Epic Tech requests that the Court reject Pen-Tech's indefiniteness claims and adopt the plain

and ordinary meaning, or the claim term constructions proposed by Epic Tech which are consistent with the language of the '317 Patent as understood by a person of ordinary skill in the art.

Respectfully submitted this 9th day of March 2022.

**BAKER, DONELSON, BEARMAN**
**CALDWELL & BERKOWITZ, PC**

*/s/ L. Clint Crosby*
L. Clint Crosby, Esq.
Georgia Bar No. 197877
Monarch Plaza, Suite 1500
3414 Peachtree Road NE
Atlanta, Georgia 30326
Tel: 678-406-8702
Fax: 678-406-8802
ccrosby@bakerdonelson.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing *Plaintiff Epic Tech, LLC's Responsive Claim Construction Brief Regarding U.S. Patent No. 8,545,317* by filing the same using the Court's ECF system, which will automatically send notification to the following counsel of record:

Vincent Bushnell, Esq.
FISHER BROYLES, LLP
945 East Paces Ferry Rd. NE, Ste 2000
Atlanta, Georgia 30326
vincent.bushnell@fisherbroyles.com

Richard Lehrer, Esq.
FISHER BROYLES, LLP
109 Normandy Drive
Woodstock, GA 30188
richard.lehrer@fisherbroyles.com

This 9th day of March 2022.

*/s/ L. Clint Crosby*
L. Clint Crosby
Georgia Bar No. 197877

*Counsel for Plaintiff*