IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EPIC TECH, LLC,<br><br>Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>PEN-TECH ASSOCIATES, INC.,<br><br>Defendant/Counterclaim Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>1:20-cv-02428-VMC |

**RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff Epic Tech, LLC ("Epic Tech") hereby responds to Defendant Pen-Tech Associates, Inc.'s ("Pen-Tech") Motion for Summary Judgment [Doc. 79].

## I. INTRODUCTION

This is a simple case about simple facts. Pen-Tech made a copycat product of the invention embodying the Patent-in-Suit, U.S. Patent No. 8,545,317 (the "'317 Patent"), which is called "Community Prize," after its sister company served as distributor servicing Community Prize customers for five years and after its largest customer requested the knock-off.

Pen-Tech admitted in its depositions it received the idea to copy Community Prize from its largest customer, Jason Mann and his company, SES, LLC. The design documents for Pen-Tech's copycat product, called "Derby Dash," contain detailed questions and answers about Community Prize's features and functionality, which

Pen-Tech's designers testified were supplied by Mr. Mann based on his observations of Community Prize in operation. Epic Tech has subpoenaed Mr. Mann multiple times, [Doc. 77], [Doc. 77-1], [Doc. 78], but he continues to ignore and evade lawful process. While Mr. Mann's full compliance will have to be compelled by this Court, the undisputed testimony is a tacit admission of the novelty, inventiveness, and financial success of the '317 Patent as viewed by disinterested customers.

It is against this backdrop that Pen-Tech filed its premature Motion to invalidate the patent as ineligible under 35 U.S.C. § 101. The Court should see this Motion for what it is: a sleight of hand to prejudice Epic Tech and distract from the expert discovery currently underway as well as Pen-Tech and Mann's bad actions.

The '317 Patent is valid for the reasons laid out herein. However, Epic Tech respectfully requests this Court hold the Motion in abeyance pending the completion of expert discovery and summary judgment briefing authorized thereafter. [Doc. 17-1]; L.R. 56.1; L.P.R. 7.2. While Epic Tech has sought and Pen-Tech has granted extensions of time to respond to the Motion, [Doc. 80], [Doc. 82], Epic Tech could not broker an extension through the expert deposition period. Therefore, in addition to filing its own dispositive Motion at the conclusion of expert discovery, Epic Tech anticipates moving for leave to supplement this Response with the benefit of the testimony garnered through expert depositions.

For the reasons outlined below, the Court should deny Pen-Tech's Motion.

## II. RESPONSE TO PEN-TECH'S ARGUMENTATIVE "STATEMENT FACTS AND PROCEDURAL BACKGROUND"

While the fact section of Pen-Tech's brief purports to discuss decades of gaming history and comparisons to other patents in the '317 Patent's family, Pen-Tech's separate, Numbered Statement of Material Facts as to which Pen-Tech contends there is no genuine issue to be tried ("Pen-Tech's SMF") contains none of this information. *See generally* [Doc. 79-48]. Therefore, the Court cannot consider them. *See* L.R. 56.1(B)(1)(d) ("The Court will not consider any fact. . . .(d) set out only in the brief and not in the movant's statement of undisputed facts.").

Instead, Pen-Tech SMF's refers only to the procedural history of cases asserting infringement of prior, related patents and the prosecution history of irrelevant, subsequent patent applications. [Doc. 79-48]. These alleged "facts" are merely legal conclusions, L.R. 56.1(B)(1)(c), and all of them are erroneous and immaterial for the reasons laid out in Epic Tech's Response to Pen-Tech's SMF filed contemporaneously herewith. L.R. 56.1(B)(2)(a)(2)(iii).

## III. EPIC TECH'S STATEMENT OF ADDITIONAL MATERIAL FACTS PRESENTING GENUINE ISSUES FOR TRIAL

### A. Mosley Invents Community Prize.

In 2011, the founder of Epic Tech's predecessor-in-interest, Robert Mosley, Sr. ("Mosley"), sought to invent a first-of-its-kind method for connecting casino-style electronic gaming machine terminals ("EGMs" or "terminals") together on a

server network to facilitate a secondary game –referred to as a "bonus game-in-game" – enabling a player to play an initial game on a terminal as well as participate in a secondary game operating in the background wherein the player becomes eligible to win a prize from the second game when it is triggered while the player is eligible to win. *See* Plaintiff's Statement of Additional Material Facts Presenting Genuine Issues for Trial filed contemporaneously herewith at ¶ 1 ("Epic Tech's SAMF"). The invention taught by the '317 patent is embodied in Epic's Tech Community Prize game offering. [Doc. 1] at ¶ 25, Epic Tech's SAMF at ¶ 2.

With the '317 Patent, Mosley and the other named inventors developed a method that allows a server network running the Community Prize game to "bridge[]" all server-based EGM games by connecting them to a shared secondary game. Epic Tech's SAMF at ¶¶ 1, 3. To achieve this result, Mosley developed a novel system architecture wherein specially enabled computers perform specific steps in specific sequences which could not be accomplished by generic computers without programming special sequence calculations and comparisons into them. *Id.* at ¶ 4.

### B. <u>Pen-Tech's Sister Company, GT Source, Is Instrumental in Community Prize Rollout; GT Source Services Community Prize Customers for Five Years Until Terminated</u>.

The Parties to this dispute and their related entities were inextricably intertwined in the Community Prize rollout. Epic Tech's predecessor company,

Gateway Gaming, Inc. ("Gateway"), first deployed Community Prize in or around August 2011. *Id*. at ¶ 5. In preparation for the rollout, Gateway hired Pen-Tech's sister company, GT Source, Inc. ("GT Source"), to assist in acquiring and troubleshooting hardware to display the Community Prize prize pools on large screens above the EGMs in customer game rooms. *Id*. at ¶ 6. Pen-Tech's owners and principles, Dwayne Graham, Greg Graham, John Jiminez, and Robert Curtis answered the call on behalf of GT Source. *Id*. at ¶ 7. The Graham brothers are also 50% owners of GT Source. *Id*. at ¶ 8.

When Gateway went to market with Community Prize, it enlisted GT Source to build EGMs and distribute software and hardware components to end customers. *Id*. at ¶ 9. GT Source distributed Community Prize and other Gateway offerings to Gateway's customers from 2011-2015. *Id*. at ¶ 10. Epic Tech terminated its relationship with Pen-Tech in 2015 following a separate lawsuit. *Id*. at ¶ 11.

### C. Pen-Tech Reappears Four Years Later with copycat "Derby Dash" Product Infringing the '317 Patent.

Pen-Tech reappeared in 2019, four years after Epic Tech terminated the relationship, with a new product offering called "Derby Dash" – the subject of this lawsuit, which Epic Tech contends infringes the '317 Patent. *Id*. at ¶¶ 12-13.

While Derby Dash's infringement is beyond the scope of Pen-Tech's early Motion on invalidity, it suffices to say Pen-Tech has admitted under oath that its primary distributor, Jason Mann, came to them with the idea to copy the Community

Prize product, and Pen-Tech's Derby Dash design documents contain detailed lists of questions and answers relating to Community Prize, its features, and functionality. *Id*. at ¶ 14. In the design process, Pen-Tech's owners also exchanged emails citing an Epic Tech patent (which Pen-Tech now contends to be the below-referenced '315 Patent), and cautioning each other to avoid patent infringement. *Id*. at ¶ 15. There would have been no reason to copy Community Prize but for its innovation in the marketplace enhancing customer enjoyment and play time in a way prior offerings did not, thereby driving consumer demand and commercial success. *Id*. at ¶ 16.

By comparison, Pen-Tech previously offered a bonus game, Mystery Box, which randomly awarded a single winner at a single EGM during every game session. *Id*. at ¶ 17. Unlike Community Prize, Mystery Box did not require a separate entry or additional ante, nor did it have a large display showing any winnings to other players in the game room; like its name, the prize was a singular "mystery" for only one player. *Id*. at ¶ 18. Pen-Tech stopped offering Mystery Box in 2019 – specifically because Derby Dash, the Community Prize knock-off Pen-Tech introduced that same year "was to be an improvement on that product [Mystery Box]." *Id*. at ¶ 19 (referring to Mystery Box as "Mystery Prize").

### D. '317 Patent's Claims.

The '317 Patent is generally directed to an electronic sweepstakes system and method that enables a player to play an initial game as well as a second game-in-

game (i.e., a secondary game on the server), wherein where the player becomes eligible to win a prize from the secondary game if the second game is triggered while the player is eligible to win. Independent Claim 1, which is representative of the Asserted Claims, is outlined in detail below:

> 1. A computer-implemented method of allowing a user to play an electronic game on a terminal, said method comprising: **[1P]**
>
> a. receiving a request from a player to play a game at a terminal; **[1(a)]**
>
> b. at least partially in response to receiving the request, facilitating play of the game at the terminal; **[1(b)]**
>
> c. at least partially in response to receiving the request from the player, establishing a bonus time period for the player; **[1(c)]**
>
> d. receiving an indication that play of a second game occurs at a particular point in time; **[1(d)]**
>
> e. determining if the bonus time period runs coincident with the particular point in time; **[1(e)]**
>
> f. determining, while the player is playing the first game, whether play of the second game results in a prize; and **[1(f)]**
>
> g. if play of the second game results in a prize and the bonus time period runs coincident with the particular point in time, awarding at least a portion of the prize to the player, wherein once the second game is triggered to play, a server conducts all play of the second game without input from the player until play of the second game is terminated. **[1(g)]**

*Id*. at ¶ 20. Independent Claim 18 implements the method of Claim 1 in an integrated system networking all EGMs in a game room to a server running Community Prize.

*Id*. at ¶ 21. In this way, Claim 18 teaches the "bridge" between EGMs Mr. Mosley referenced in his deposition. *Id*.

## IV. ARGUMENT AND CITATION TO AUTHORITIES

### A. Legal Standard on Motion for Summary Judgment.

Summary judgment is appropriate where the record, read in the light most favorable to the non-moving party, shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The initial burden is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex* at 423. If the moving party meets its burden, then the non-moving party must produce responsive evidence as to the merits of its claims that is also sufficient to show that a genuine issue of material fact has been presented. *Celotex* at 322-23. When deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine factual dispute issue exists, and the motion must be denied. *Id.* at 248.

Claims of issued patents are presumed valid, and the party challenging validity can only overcome that burden by clear and convincing evidence. 35 U.S.C. § 282; *see Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

### B. <u>Patent Eligibility Under 35 U.S.C. § 101 and *Alice*'s Two-Step Inquiry</u>.

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor[.]" 35 U.S.C. § 101. The courts have created judicial exceptions or inventions covering "[l]aws of nature, natural phenomena, and abstract ideas." *Alice Corp. Pty. LTD. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citation omitted). However, claims containing an "inventive concept" recited in an additional specific element or combination of elements that are "significantly more" may be sufficient to "transform" the exception into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. Thus, Section 101 thus may be viewed as a "course eligibility filter" with patentability. *California Institute of Technology v. Hughes Communications*, 59 F. Supp. 3d 974, 979 (C.D. Cal. 2014).

In *Alice*, the Supreme Court prescribed a two-step inquiry for addressing whether a claim is drawn to subject matter that falls outside the scope of Section 101. **Step 1** is to determine whether the claim at issue is directed to a "patent-ineligible concept" such as a natural phenomenon, an abstract idea, or a law of

nature. *Alice*, 134 S. Ct. at 2355. If so, the court proceeds to **Step 2** and asks "[w]hat else is in the claims," *Mayo*, 132 S. Ct. at 1297, and whether the claims contain an "'inventive concept'— *i.e.*, 'an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.'" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297).

**C. The '317 Patent is Presumed Valid.**

"An issued patent enjoys a presumption of validity[, and] a party challenging patent validity has the burden to prove its case with clear and convincing evidence." *Haddad v. United States*, 164 Fed. Cl. 28, 33 (2023) (quoting *Impax Labs., Inc. v. Aventis Pharm., Inc.*, 545 F.3d 1312, 1314 (Fed. Cir. 2008)) (alteration in original). This presumed validity remains intact even though the '317 Patent was issued before *Alice*. Pen-Tech may only overcome this burden by clear and convincing evidence – which is wholly absent here. *Microsoft Corp*, 131 S. Ct. at 2242. Nevertheless, the '317 Patent is valid under *Alice* for the reasons outlined below.

**D. No *Per Se* Rule Against Software Gaming Patents.**

As a threshold matter, Pen-Tech seemingly asks this Court to hold software gaming patents are *per se* unpatentable. This is a mischaracterization of the legal landscape. The United States Court of Appeals for the Federal Circuit, which has exclusive jurisdiction over patent appeals, has specifically eschewed such a bright-

line rule. Specifically, in *In re Smith*, 815 F.3d 816 (Fed. Cir. 2016), relied upon by Pen-Tech, [Doc. 79-2] at 21, the Court held that, although it was invaliding a gaming patent directed to a "method of conducting a wagering game" using a deck of playing cards as being drawn to an abstract idea, its decision was "not to say that all inventions in the gaming arts would be foreclosed from" eligibility under Section 101. *See In re Smith*, 815 F.3d at 819. This principle was recently confirmed in *In re Marco Guldenaar Holding B.V.*, 911 F.3d 1157 (Fed. Cir. 2018), where the Federal Circuit reiterated: "As we explained in *Smith*, inventions in the gaming arts are not necessarily foreclosed from patent protection under § 101." 911 F.3d at 1162.

**E. <u>The '317 Claims are Drawn to Patent-Eligible Subject Matter</u>.**

1. <u>*Alice* Step 1: The claims are not drawn to an abstract idea</u>.

This is not a case where the Asserted Claims are directed to the rules of a card game like *In re Smith*, or the rules of a dice game like *Guldenaar*. [Doc. 79-2] at 21. "The Court [should] see[] little similarity between claims that outline abstract rules for playing a game and the '[317] claims, which pertain to specific steps for setting up common, randomized gameplay in a networked computing environment" when properly construed in light of the '317's Specification. *Skillz Platform Inc. v. Aviagames Inc.*, No. 21-CV-02436-BLF, 2022 WL 783338, at *10 (N.D. Cal. Mar. 14, 2022) (denying motion to dismiss patent entitled "Peer-to-Peer Wagering Platform" because patent passed *Alice* Step One); *Phillips v. AWH Corp.*, 415 F.3d

1303, 1313, 1315 (Fed. Cir. 2005); Zatkovich Decl., attached to SAMF as Ex. B, at ¶¶ 70-73.

"At a high level, the '[317] Patent pertains to a plurality of [terminals] participating in a [secondary game] by communicating with remote game servers." *Skillz*, 2022 WL 783338, at *7. The '317 Patent's claims "are directed to a specific improvement in computer technology" – *e.g.*, the "bridge" between terminals through a networked server running the Community Prize game. *Id*. at *10; Epic Tech's SAMF at ¶ 3. This configuration allows players to play a first game on the EGM that earns them eligibility to potentially win the secondary, Community Prize game that plays in the background (though it may do so asynchronously). Zatkovich Decl. at ¶¶ 22-32. This "provides an enjoyable experience for the player and encourages them to continue play on the gaming terminal" longer, thereby driving revenue on the base game. '317 at 3:14-19. As the Specification discloses, this networking of EGM terminals to a server running the secondary game solved the problem of "not always keep[ing] the player engaged." *Id*. at 1:20-23. While Pen-Tech contends this advancement was not novel, its argument is belied by its record admissions its "Mystery Box" game (another bonus game Pen-Tech previously offered which was only played on one EGM as opposed to a networked system of EGMs) performed so poorly that Pen-Tech's primary customer/distributor, Jason Mann, suggested Pen-Tech copy Community Prize. SAMF at ¶¶ 17-19.

Thus, the ‘317 “claims are directed to a specific improvement in computer technology. . . to providing common gameplay to different users[.]” *Skillz*, 2022 WL 783338 at *10. These specific improvements “are similar to those courts have found sufficient to withstand eligibility challenges in other cases.” *Id*. (citing *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1343-45 (Fed. Cir. 2016) (vacating dismissal of patent claims where patent “describes its invention as combining the advantages of the then-known filtering tools while avoiding their drawbacks”); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304 (Fed. Cir. 2018) (affirming denial of motion for judgment as a matter of law for patent ineligibility where claimed invention “enables more flexible and nuanced virus filtering”)). There is no abstract idea.

a. *Pen-Tech’s “abstract idea” oversimplifies the ‘317.*

Pen-Tech argues the ‘317 Patent “merely involves the abstract idea of receiving information from a user, receiving information from the system, setting a timer, displaying information, and determining next steps[.]” [Doc. 79-2] at 21. This argument “fail[s] to heed the Federal Circuit’s warning that ‘describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures exceptions to § 101 swallow the rule.” *Skillz*, 2022 WL 783338 at *9 (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016)).

Setting aside this glaring deficiency, all of the alleged "proofs" Pen-Tech offers in support of its abstract idea argument fall flat for the reasons outlined below.

b. *Pen-Tech's "sweepstakes clerk" hypothetical fails*.

"The overbreadth of [Pen-Tech]'s account of the '[317] claims is confirmed by the inapplicability of its real-world analogy." *Id*. Pen-Tech advances the tired "sweepstakes clerk" fallacy, essentially arguing "the steps of the Asserted Claims are merely the automation, using general purpose computers [[1]] by humans" acting as sweepstakes clerks in a gaming location. Other courts addressing similar arguments have rejected the human implementation arguments as "too remote from the claim elements." *Skillz*, 2022 WL 783338 at *9. The same reasoning applies here with equal force.

First, despite Mr. Friedman hypothesizing in his rebuttal report that a human could perform the '317's claimed steps, including by monitoring each EGM networked to a secondary game, Pen-Tech has failed to introduce any evidence that "real-world [*secondary* games] were previously organized via a process analogous to the '[317] claims." *Skillz*, 2022 WL 783338 at *9 (emphasis added).

Moreover, it would be impractical – if not impossible – for a human to perform the '317's specific steps on the multiple (if not dozens) of game terminals contemplated by the '317 Patent, which may be located at different locations

[1] Which is also incorrect for the reasons described in Section IV.E.1.c., *infra*

throughout a game room. Zatkovich Decl. at ¶ 33-35, 40-45. Even if each terminal had its own sweepstakes clerk, that clerk would have to instantaneously: (1) know when a player requested to play the game: (2) facilitate play and establish or add to a bonus timer period – two acts which must occur simultaneously; and then (3) maintain or decrement the bonus time period while a *separate person* triggered the secondary game and notified each clerk the game had occurred. *Id*. at ¶¶ 39-40. The person monitoring each game terminal must then receive the indication the second game has occurred and determine if the second game occurred while their player still had bonus time remaining (again, within a fraction of a second of accuracy), and whether the second game resulted in a win. *Id*. at ¶ 39. If so, each person monitoring an eligible player would award some portion of the prize to that player. *Id*. In a close call where the bonus time period is running out, a person would have to accurately <u>know</u> if the bonus time period ran out an instant just before, or an instant just after, the second game occurred. *Id*. at ¶ 40. Epic Tech's expert witness, Ivan Zatkovich, who has yet to be deposed, contends this is impossible for humans. *Id*.

At bottom, however, the "sweepstakes clerk" analogy fails because Pen-Tech "fails to assert this real-world analog [which has no evidence of ever having been applied as to secondary game] is either (1) a long-standing, conventional practice or (2) that the '317 claims would be broad enough to cover such conduct." *Skillz*, 2022 WL 783338 at *10.

c. *The '317 Patent requires specialized computers running specialized software.*

Pen-Tech also argues that the '317 "claims recite generic computer components used in their conventional capacities." *Id.* at *11; [Doc. 79-2] at 1, 7, 10, 13, 17-22.

Pen-Tech is wrong. The '317 requires specialized computers running specialized software to embody the invention taught in the '317 Patent. Zatkovich Decl. at ¶¶ 46-80. While the steps of the Asserted Claims *could* be performed on a generic computer, generic computers do not come equipped with software capable of handling the special sequence of calculations and comparisons required by the claims. *Id.* at ¶¶ 47-48. Instead, these must be programmed into the computer software or hardware. *Id.* at ¶ 47. For example, Figure 2 of the '317 specification is a flow diagram describing an algorithm with a specific sequence of calculations and comparisons that would be performed in Claim 1 and 18. *Id.* at ¶¶ 49-50.

The '317's Specification describes in detail how each step in this algorithm may be performed, including various alternatives within some of the steps. *Id.* at ¶ 50. For example, a plurality of players may request to play a game as opposed to the at least one player. *See id.* (citing '317 at Fig. 2, Step 202). In this embodiment, the system must thereafter establish a bonus time period. *Id.* The specification identifies specific ways in which this can be accomplished, including: (1) displaying the bonus time period as a countdown timer ['317 6:62-65] <u>or</u> a sequence of colors. *Id.* at 6:65-

7:5; or (2) maintaining the bonus time period as a predetermined time – *e.g.* – fifteen seconds of eligibility – or as a variable duration that can be added to – *e.g.*, five second increments of eligibility that may "accumulate each time the player submit a request to play the game at [the] terminal" for an unlimited period of time, *Id*. at 7:11-18, or be capped at a predetermined upper limit (*e.g.*, 25 seconds). *Id*. at 7:18-21; *also* Zatkovich Decl. at ¶¶ 50-56. These functions for establishing and maintaining a bonus time period are not present on a generic computer. Zatkovich Decl. at ¶ 57. They must the programmed into specialized computer software or hardware. *Id*.

The same is true for the specific criteria triggering the second game at a particular point in time, which could be accomplished by assigning a random number of spins which must be decremented by each request to play a game until the counter reaches zero or assign a random number within a minimum and maximum range so that play of the secondary game occurs at random times (based on the random number of spins selected as the trigger and the volume of play that occurs at the game terminals). The functions for first triggering and then comparing the occurrence of a second game with a bonus time period are also not present in a generic computer. *Id*. at ¶¶ 58-61. They must be programmed into specialized computer software or hardware. *Id*. at ¶ 61.

Finally, the specification details specific methods for determining and awarding prizes. *Id*. at ¶ 62. The prizes may either be shared, or in embodiments where the prize is not a shared prize, the system may randomly choose one player from a plurality of eligible players whose bonus period runs coincident with the particular point in time and award the prize to that player. *Id*. The functions for determining who will win a prize and the prize amount are not present in a generic computer. *Id*. at ¶ 63. They must be programmed into specialized computer software or hardware. *Id*. at ¶¶ 64-68. For all of these reasons, Pen-Tech's overbroad "abstract idea" argument fails. The '317 is valid at *Alice* Step 1.

2. *Alice* Step 2: '317 Patent Claims Contain an Inventive Concept.

In the unlikely event the Court determines the '317 Patent is directed to an abstract idea (and it is not for the reasons set forth above), the Asserted Claims provide an inventive concept and integrate the judicial exception into a practical application in a manner that imposes meaningful limitations such that the Claims pass *Alice* Step 2.[2]

The evaluation of the "integration into a practical application" involves (a) identifying whether there are additional elements recited in the claim beyond the judicial exception; and (b) evaluating those additional elements individually or in

[2] These claims are patent eligible subject to the novelty and non-obviousness evaluations, which Pen-Tech did not raise in its Motion.

combination to determine whether they integrate the exception into a practical application. *See* USPTO Manual of Patent Examining Procedure ("MPEP") § 2106.04(d). These considerations include improvements to the functioning of a computer or an improvement to other technology or technical field, while excluding consideration of whether the additional elements represent well-understood, routine, or conventional activity. *Id*.

First, it is undisputable that the '317 Patent is an inventive concept of a bonus game-in-game that can play in the networked background to entice EGM players to play longer at the EGM. SAMF at ¶ 3. This concept was so inventive and effective at engaging players to keep playing longer (thereby increasing revenue of the base EGM game), that Pen-Tech's customers, apparently dissatisfied with prior Mystery Box offering specifically requested Pen-Tech knock off Community Prize with what became Pen-Tech's Derby Dash offering. SAMF at ¶¶ 17-19. Thus, Pen-Tech can hardly be heard now to claim the '317 Patent lacks an inventive concept.

Second, the claim language integrates this invent concept into a practical application. Claim 18 teaches that a server conduct all the following functions: (1); receiving a request to play a game (claim element 18.b.i); (2) facilitating play of the first game (claim element 18.b.ii); (3) establishing or adding time to a Bonus Time period (claim element 18.b.iii and claim construction); (4) receiving an indication that secondary game occurred <u>and</u> resulted in a prize (claim element 18.b.iv); (5)

determining if second game occurred during bonus time period (claim element 18.b.v); and (6), if so, awarding a portion of the prize to the at least one player (claim element 18.b.vi). While Pen-Tech may claim one or more of these individual elements were known in the prior art (though this is not advanced in Pen-Tech's L.R. 56.1(B) SMF, and therefore, the Court cannot consider it - L.R. 56.1(B)(1)(d)), the ordered combination in the "bridge" between networked EGMs provides an integrated, practical application conferring patent eligibility. SAMF at ¶ 3. Moreover, Mr. Zatkovich has opined the Bonus Time Period and Multi-Player Interactions are each inventive steps and improvement in the technology conferring patent eligibility. Zatkovich Decl. at ¶¶ 81-94, 107.

For all of these reasons, the '317 is valid at *Alice* Step 2. The Court should deny Pen-Tech's Motion. Additionally or in the alternative, to the extent the Court disagrees with this analysis, then "[w]hether the claim elements or the claimed combination are well-understood, routine, or conventional is a question of fact" warranting jury consideration, as Pen-Tech's SMF sets forth no undisputed evidence – let alone the "clear and convincing evidence" required to overcome the presumption of validity – that the claims of the '317 are not entitled to patent protection. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018); *Microsoft*, 131 S. Ct. at 2242; *generally* Epic Tech's Resp. to Pen-Tech's SMF; L.R. 56.1(B)(2)(a)(2)(iii).

### F. **<u>Pen-Tech's Reliance on *Fusion Skill* is Misplaced</u>.**

Despite having previously shown concern about infringing it, SAMF at ¶ 15, Pen-Tech now asks this Court to follow the analysis temporarily invalidating a related patent, the '315 Patent, in the prior case *Fusion Skill*. The *Fusion Skill* order has been vacated, Pen-Tech's SMF ¶ 5; [Doc. 79-37], and the '315 Patent resumes its enjoyment of presumed validity under 35 U.S.C. § 282 – as does the '317 Patent. Even without the vacatur, *Fusion Skill* is of no persuasive value. The vacated *Fusion Skill* decision on the '315 Patent is flawed in more ways than are relevant to this brief. However, it suffices to say that the '317 claims literally replace all of the alleged undisclosed or abstract concepts of the '315 patent ("predetermined action," "first criterion") with specific and concrete criteria and functions as described in the Zatkovich Decl. at ¶¶ 95-107. The Court should deny Pen-Tech's Motion.

### G. **<u>Prosecution Histories for Subsequent, Abandoned Patent Applications are Irrelevant to '317 Patent's Validity</u>.**

Pen-Tech makes much over subsequent but abandoned patent applications in the '317 family. This argument is a red herring. "Defendant[]. . . . cite[s] to no authority," and courts have found none, "for the proposition that . . . the prosecution history of a later patent [can] reach back and limit a claim using the same element in an earlier related patent." *E.g.*, *Jeneric/Pentron, Inc. v. Dillon Co., Inc., Chemichl Inc., Chemichl AG.*, 171 F. Supp. 2d 49, 77 (D. Conn. 2001). Pen-Tech has admitted

this legal principle in its Requests for Admissions. *See* Epic's Resp. to Pen-Tech's SMF at Resps. to ¶¶ 6-17.

Moreover, the filing of a terminal disclaimer for the '113 Application has no bearing on this Court's *Alice* analysis. "In legal principle, the filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection." *Quad Env't Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 874 (Fed. Cir. 1991). "It is improper to convert this simple expedient of 'obviation' into an admission or acquiescence or estoppel on the merits." *Id*. Pen-Tech has also admitted this is the law. *See* Epic's Resp. to Pen-Tech's SMF at Resp. to ¶ 8. For all of these reasons, the '113 and '337 Applications are irrelevant.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Pen-Tech's Motion, or, in the alternative, hold it in abeyance for contemporaneous consideration with any cross-motions filed at the conclusion of expert depositions.

Respectfully submitted this 27th day of November 2023.

**BAKER, DONELSON, BEARMAN CALDWELL & BERKOWITZ, PC**

*/s/ L. Clint Crosby*
L. Clint Crosby, Esq.
Georgia Bar No. 197877
Tyler P. Bishop, Esq.
Georgia Bar No. 566705

Jordana K. Oppenheim, Esq.
Georgia Bar No. 825750
3414 Peachtree Road, NE, Suite 1500
Atlanta, Georgia 30326
Tel: 678-406-8702
Fax: 678-406-8802
ccrosby@bakerdonelson.com
tbishop@bakerdonelson.com
joppenheim@bakerdonelson.com

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in Local Rules 5.1(C) and 7.1(D).

Respectfully submitted this 27th day of November 2023.

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**

*/s/ L. Clint Crosby*
L. Clint Crosby
Georgia Bar No. 197877
ccrosby@bakerdonelson.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing document to be filed with the Clerk of Court using the CM/ECF system, which automatically will send electronic mail notification to all counsel of record.

Respectfully submitted this 27th day of November 2023.

**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, PC**

*/s/ L. Clint Crosby*
L. Clint Crosby
Georgia Bar No. 197877
ccrosby@bakerdonelson.com

*Counsel for Plaintiff*