**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| EPIC TECH, LLC,<br><br>Plaintiff,<br><br>v.<br><br>PEN-TECH ASSOCIATES, INC,<br><br>Defendant. | Civil Action No.<br>1:20-cv-02428-VMC |

**ORDER**

This matter is before the Court on cross motions for summary judgment. Plaintiff Epic Tech, LLC ("Epic Tech") moves for summary judgment on the issue of whether Defendant Pen-Tech Associates, Inc. ("Pen-Tech") infringed U.S. Patent No. 8,545,317 (as defined below, the '"317 Patent") (Doc. 104). Pen-Tech separately moves for summary judgment on the invalidity of the '317 Patent under 35 U.S.C. § 101. (Doc. 79). For the reasons below, the Court will grant Pen-Tech's summary judgment motion and deny Epic Tech's summary judgment motion.

**Background**

## I. Undisputed Facts

Epic Tech is a developer and marketer of electronic games used throughout the country, and the owner of several patents, including Patent No. 8,545,317 (the '"317 Patent"). (Doc. 84-1 ¶ 1). Epic Tech has embodied the invention patented in the '317 Patent into its Community Prize game offering. (*Id.* ¶ 2). Pen-Tech is also

in the gaming industry. (*Id.* ¶12). In 2019, Pen-Tech created a product offering called "Derby Dash." (*Id.*). Epic Tech contends Derby Dash infringes the '317 Patent under 35 U.S.C. § 271(a). (*Id.* ¶ 13). Specifically, Epic Tech asserts that Derby Dash infringes on claims 1, 2, 4, 5, 7–10, and 18 of the '317 Patent. (the "Asserted Claims," Doc. 79-44 at 2).

The Abstract of the '317 Patent provides an overview of the invention taught by the patent:

> A secondary gaming system, in various embodiment, comprises a system of networked game termination where a player playing a game on a game terminal can earn eligibility to win a prize from a secondary game that plays simultaneously in the background. The secondary game may be triggered based on play on the plurality of networked terminals. This allows a player to play a first game that earns them eligibility to win another game that is played in the background. The player sends a game initiation request for a game (e.g., lottery slot) to be played on the game terminal. If a certain criterion is satisfied, the player becomes eligible to win a prize from the secondary game if the secondary game is triggered while the player is eligible to win.

(Doc. 79-4 at 2). There are two independent claims in the '317 Patent: claims 1 and 18. Claim 1 of the '317 Patent states the following:

> **1.** A computer-implemented method of allowing a user to play an electronic game on a terminal, said method comprising:
>
> a. Receiving a request from a player to play a game at a terminal;

> b. at least partially in response to receiving the request, facilitating play of the game at the terminal;
>
> c. at least partially in response to receiving the request from the player, establishing a bonus time period for the player;
>
> d. receiving an indication that play of a second game occurs at a particular point in time;
>
> e. determining if the bonus time period runs coincident with the particular point in time;
>
> f. determining, while the player is playing the first game, whether play of the second game results in a prize; and
>
> g. if play of the second game results in a prize and the bonus time period runs coincident with the particular point in time, awarding at least a portion of the prize to the player; wherein once the second game is triggered to play, a server conducts all play of the second game without input from the player until play of the second game is terminated.

(Doc. 79-4 at 16). Claim 18 of the '317 Patent is substantially the same as claim 1, but it is a system claim. (*Id.* at 17).

In short, the '317 Patent is generally directed to an electronic sweepstakes system and method that enables a player to play an initial game as well as a second game-in-game (i.e., a secondary game on the server), where the player becomes eligible to win a prize from the secondary game if the second game is triggered while the player is eligible to win. (Doc. 84-1 ¶ 20).

## II. Procedural History

Epic Tech filed this patent infringement lawsuit against Pen-Tech on June 5, 2020. (Doc. 1). A month later, Pen-Tech filed its Answer and Counterclaims, which alleged that the Asserted Claims were invalid for failure to satisfy one or more of the requirements for patentability set forth in the patent laws of the United States Code, including without limitation 35 U.S.C. § 101. (Doc. 10).

On September 1, 2021, Epic Tech served its Infringement Contentions, which added an assertion of Claim 18 of the '317 Patent. (Doc. 79-44 at 2). That same day Pen-Tech served its Invalidity Contentions, which asserted that claims 1, 2, 4, 5, and 7-10 of the '317 Patent are invalid under 35 U.S.C. § 101. (Doc. 34). Nine days later Pen-Tech served its Supplemental Invalidity Contentions, which added claim 18 to the list of invalid claims under § 101. (Doc. 36).

The Court appointed Special Master William H. Needle to conduct claim construction in this case. (Doc. 45). The Special Master issued his Report and Recommendation on claim construction, which the Court adopted on January 23, 2023. (Doc. 62). Pursuant to that order, most of the disputed claims were construed according to their "plain and ordinary meaning." (*Id.*). That said, the term "bonus time period" was construed to mean "[t]he duration of eligibility available to the [sic] at least one player in order to be awarded at least a portion of the prize from the secondary game." (*Id.* at 3).

## Legal Standards

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex*, 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden

of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

On cross-motions for summary judgment, "[t]he standard of review. . . does not differ from the standard applied when one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Loiseau v. Thompson, O'Brien, Kemp & Nasuti, P.C.*, 499 F. Supp. 3d 1212, 1219 (N.D. Ga. 2020) (quoting *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1315–16 (N.D. Ga. 2013)). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Cross-motions may . . . be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id*. (citing *U.S.*

*ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 972 F. Supp. 2d 1339, 1341 (N.D. Ga. 2013)).

**Discussion**

The Court will first discuss Pen-Tech's Motion for Summary Judgment. (Doc. 79). Then, as needed, the Court will address Epic Tech's Motion for Summary Judgment. (Doc. 104).

## I. Pen-Tech's Summary Judgment Motion[1]

Pen-Tech argues that it is entitled to summary judgment because the Asserted Claims of the '317 Patent are invalid as a matter of law for claiming ineligible subject matter under 35 U.S.C. § 101. Epic Tech disputes Pen-Tech's assertions. (Doc. 84). For the reasons below, the Court agrees with Pen-Tech and finds the '317 is invalid as a matter of law.

As a threshold issue, the parties do not appear to dispute that independent Claim 1 is representative of the Asserted Claims. *See e.g.* (Doc. 79 at 7-8; Doc. 84 at 7); *see also Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 991 (Fed. Cir. 2018) (citing *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014)) ("In a § 101 analysis, courts may evaluate representative claims."). Accordingly, the Court will use independent

[1] Epic Tech indicated that it would move to supplement its response to Pen-Tech's summary judgment motion "with the benefit of the testimony garnered through expert deposition." (Doc. 84 at 2). However, no supplemental response was filed.

Claim 1 of the '317 Patent as the representative claim for the remainder of the § 101 analysis.

**A. The '317 Patent is Invalid Under Section 101**

The '317 Patent was issued prior to the Supreme Court's decision in *Alice Corp. Pty. Ltd v. CLS Bank International,* 573 U.S. 208, 216 (2014). In *Alice*, the Supreme Court established a new standard for patent eligibility under 35 U.S.C. § 101. As explained below, the '317 Patent is invalid under the two-part test articulated in *Alice*.

Under section 101, "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may be eligible for patent protection. Any analysis under section 101 "begins by identifying whether an invention fits within one of the four statutorily provided categories or patent-eligible subject matter: processes, machines, manufactures, and compositions of matter." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713–14 (Fed. Cir. 2014). The Supreme Court has recognized an "important implicit exception" to this definition of patentable subject matter, however. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.,* 566 U.S. 66, 70 (2012). Specifically, excepted from section 101's reach are "laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (quoting *Diamond v.*

*Chakrabarty*, 447 U.S. 303, 309 (1980)). This case concerns the final category of "abstract ideas."

"[A]n invention is not rendered ineligible for [a] patent simply because it involves an abstract concept." *Alice,* 573 U.S. at 217. The Supreme Court has provided a two-step test for determining whether a patent concerns an abstract idea. First is the determination of "whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* If the claims focus on a patent-ineligible concept, then the court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 79). This second step entails "a search for an inventive concept—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (alteration in original) (quoting *Mayo*, 556 U.S. at 73). An "inventive concept must do more than simply recite 'well-understood, routine, conventional activity.'" *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016) (quoting *Mayo*, 556 U.S. at 79).

**i. Step One of *Alice* Analysis**

Step one of the *Alice* inquiry asks "what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278,

1292 (Fed. Cir. 2020) (punctuation omitted) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)). The Court must focus on the language of the claims at issue and consider that language in light of the patent's specification. *Id.* "In cases involving software innovations, this inquiry often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *Id.* at 1293. (quoting *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020)).

The '317 Patent fails step one of *Alice* because it is directed to processes rather than improvements to computer capabilities. Specifically, the '317 Patent is directed to the rules of playing a game and awarding a bonus game while a player is playing an existing game. The '317 Patent sets forth a method whereby a computer receives information from a user, receives information from the system, sets a timer, displays information, and finally determines next steps based on the information received and the status of the timer. (Doc. 78-2 at 21; 88-9 ¶¶ 39-40). Claim 1 of the '317 Patent does not recite a novel improvement in computer systems. Instead, Claim 1 instructs that its method "may be, for example, embodied as a computer system, a method, or a computer program product." (Doc. 104-2 at 14). Moreover, the '317 Patent's specification states that "various embodiments may take the form of an entirely hardware embodiment, an entirely

software embodiment, or an embodiment combining software and hardware aspects." (*Id.*). And, "[a]ny suitable computer-readable storage medium may be utilized including, for example, hard disks, compact disks, DVDs, optical storage devices, and/or magnetic storage devices." (*Id.*).

Thus, the Court is not persuaded by Epic-Tech's argument that the '317 Patent discloses a specific system architecture that must be employed because this argument is contrary to the language in the '317 Patent. "Ultimately, '[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves,' . . . and the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) (quoting *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016)).

Epic Tech also argues that Pen-Tech oversimplifies the '317 claims. In Epic Tech's view, the '317 claims are directed to a specific improvement in computer technology. (Doc. 84 at 13). This improvement, "'provides an enjoyable experience for the player and encourages them to continue play on the gaming terminal' longer, thereby driving revenue on the base game." (*Id.* at 12) (quoting Doc. 79-4 at 3:14-19). But this method is not unique simply because it encourages players to spend more money. Rather, "this 'unique solution' is nothing more than an abstract marketing concept." *Epic Tech, LLC v. Fusion Skill, Inc.*, 534 F. Supp. 3d 741,

746 (S.D. Tex. 2021), *vacated by consent of the parties*, No. 4:19-CV-02400 (S.D. Tex. July, 6, 2022), ECF No. 365.

Next, Epic Tech relies heavily on the district court's opinion in *Skillz Platform Inc. v. Aviagames Inc.*, No. 21-CV-02436-BLF, 2022 WL 783338, at *6 (N.D. Cal. Mar. 14, 2022) for the proposition that the '317 Patent claims are not abstract because they "pertain to specific steps for setting up common, randomized gameplay in a networked computer environment." (Doc. 84 at 11) (quoting *Id.* at *10). But in that case, the steps in the representative claim included "steps of distributing game data to client devices, using a unique match identifier to generate pseudo-random numbers, and other limitations . . ." *Skillz Platform Inc.*, 2022 WL 783338 at *10. In contrast, the steps of Claim 1 all concern the timing of initiating a game within a game. In this way, Claim 1 of the '317 Patent is more similar to the patent in *In re Smith*, 815 F.3d 816, 818–19 (Fed. Cir. 2016). There, the Federal Circuit concluded that the "'method of conducting a wagering game' [was] drawn to an abstract idea." *Id.* at 819.

Lastly, Epic Tech argues that the '317 Patent is not dedicated to an abstract idea because it would be "impractical – if not impossible – for a human to perform the '317's specific steps on the multiple (if not dozens) of game terminations contemplated by the '317 Patent[.]" (Doc. 84 at 14–15). However, the Federal Circuit has long held that "[a]utomation or digitization of a conventional method

of organizing human activity. . . does not bring the claims out of the realm of abstractness." *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022). So, while it may be true that aligning the timing of playing a first game and a bonus game would be difficult for a sweepstakes clerk, it is not impossible. The '317 Patent outlines an automated system to perform specific steps, none of which are unique. And courts have emphasized that, "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015).

For the reasons above, the Court finds that the claims of the '317 Patent are directed to an abstract idea. Therefore, the Court next considers whether the '317 Patent satisfies *Alice* Step 2.

**ii. Step Two of *Alice* Analysis**

Under the second step of *Alice*, the Court "must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 72, 79). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* (quoting *Mayo*, 556 U.S. at 77). This "transformation into a patent-eligible application requires 'more

than simply stat[ing] the [abstract idea] while adding the words 'apply it.'" *Id.* (quoting *Mayo*, 556 U.S. at 72).

The Supreme Court has "described step two of this analysis as a search for an 'inventive concept'—i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (citing *Mayo*, 566 U.S. at 72–73).

Pen-Tech argues that the elements of the '371 claims are insufficient to transform the nature of the claim into an inventive concept because they "merely recite ordinary functions carried out by one or more general purpose computers." (Doc. 79-2 at 24). According to Pen-Tech's expert, claims 1 and 18 of the '317 Patent are "directed to an abstract idea for playing a game for which generic computer technology is involved merely as a tool to perform that game using the computer technology according to its normal, conventional functions." (Doc. 79-5 ¶¶ 78, 82).

On the other hand, Epic Tech asserts that it cannot be disputed "that the '317 Patent is an inventive concept of a bonus game-in-game that can play in the networked background to entice EGM players to play longer at the EGM." (Doc. 84 at 19). Epic Tech also contends that the claim language in the '317 Patent integrates this inventive concept into a practical application. *Id.* The Court is not persuaded by either of Epic Tech's arguments.

A bonus game within a game is not an inventive concept. Epic Tech argues that facts suggesting that Pen-Tech may have copied elements of the '317 serves to prove "[t]his concept was so inventive and effective at engaging players to keep playing longer[.]" (Doc. 84 at 19). But the fact that Pen-Tech may have copied elements of the '317 Patent does not make an abstract idea an inventive concept under *Alice. See e.g. In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 609 (Fed. Cir. 2016). The '317 Patent's bonus game within a game concept is not inventive because many games have employed these same methods. As Pen-Tech's expert explained,

> Just as the typical winning combination in most slot games is a line pay, the typical award on a paytable is a fixed value. To increase player entertainment, however, game developers created other game features such as bonus games or series of free spins that may provide a wide range of awards rather than a fixed value . . .
>
> Commonly, free spin games are played with different game rules, payouts, symbols, reel strips, or other features than the main game.

(Doc. 79-5 ¶ 50). Because the idea of a bonus game within a game was introduced long before the priority date of the '317 Patent, the Asserted Claims are not inventive.

Epic Tech also asserts that the "Bonus Time Period" and the "Multiplayer Interactions" of the '317 Patent "are each inventive steps and improvements in the technology conferring patent eligibility." (Doc. 84 at 20). The Court disagrees. As

it relates to the "Multiplayer Interaction," the Patent allows for such interactions to be optional. Thus, it is not an inventive concept that transforms the '317 Patent's abstract claims to patentable claims.

Likewise, the "Bonus Time Period" is not an inventive concept. Epic Tech's expert contends that the "Bonus Time Period" of the '317 Patent is inventive because it "improves not just the incentive to play the first game, but to play the first game more frequently. Playing the first game more frequently is a way to accumulate bonus time." (Doc. 88-9 ¶ 77). Contrary to Epic Tech's expert's assertion, this concept is not novel. In fact, Pen-Tech's expert points out at least one sweepstakes game, Cleopatra, that similarly uses bonus games to drive player loyalty and excitement. (Doc. 79-5 at 20). In addition, the "Bonus Time Period" is not always some magical unpredictable number. The specification itself states that [i]n some embodiments, the bonus time period may be a predetermined amount of time, for example, 15 seconds of eligibility. (Doc. 79-4 at 15). Because Epic Tech has failed to demonstrate that the '317 Patent claims any legitimately inventive concepts, the Court will grant summary judgment to Pen-Tech on the validity of the '317 Patent.

### B. Persuasive Authority Supports the Court's Analysis

#### i. The *Fusion Skills Case*

Pen-Tech relies heavily on the district court's vacated opinion in *Epic Tech, LLC v. Fusion Skill, Inc.*, 534 F. Supp. 3d 741, 746 (S.D. Tex. 2021), *vacated by consent of the parties*, No. 4:19-CV-02400 (S.D. Tex. July, 6, 2022), ECF No. 365. Notably, Epic Tech does not deny that the '317 Patent is a continuation-in-part of the '315 Patent at issue in *Fusion Skills.*[2] Instead, Epic Tech argues that "[t]he '317 claims literally replace all of the alleged undisclosed or abstract concepts of the '315 patent ("predetermined action," "first criterion") with specific and concrete criteria and functions." Even so, the Court finds the reasoning in *Fusion Skill* persuasive and directly on point because the '317 Patent and the '315 Patent involve the same subject matter.

In *Fusion Skill*, the district court found the '315 patent invalid under § 101. Like the '317 Patent in this case, the '315 patent involved a method for conducting computer-based sweepstakes bonus games. *Fusion Skill*, 534 F.Supp.3d at 743. The district court explained that the '315 patent failed *Alice* step one because "[i]t does not claim any novel usage or configuration of computer hardware or software." *Id.* at 745. Additionally, the '315 patent failed *Alice* step two because "it simply

[2] The Epic Tech and the Defendants in *Fusion Skill* agreed to vacate the district court's summary judgment order through settlement.

claims the idea of putting two computers next to each other and having the second computer initiate a game if the first computer produces a winning result." *Id.* at 746.

As explained above, the '317 Patent contains the same flaws as the '315 Patent. Despite Epic Tech's insistence, the '317 Patent lacks any technological computer or software innovation. In fact, the '317 Patent itself states that "[e]mbodiments of the invention are agnostic to the methods in which the results are delivered." For these reasons, the Court is persuaded by the opinion in *Fusion Skill*, and considered that case in determining the validity of the '317 Patent under § 101.

**ii. USPTO's Prior Opinions About the '317 Patent**

Separately, the Court is persuaded by USPTO's prior opinions about the '317 Patent. On August 28, 2013, U.S. Patent Applications No. 14/012,113 entitled "Gaming System and Method" (the '"113 Application") was filed with the USPTO. (Doc. 79-5 ¶ 91; Doc. 79-28). The '113 Application claimed priority to the '105 Application[3] as a continuation of the '105 application. (Doc. 79-29).

A few months later, the USPTO rejected claims 4 to 13 of the '113 Application "on the ground of nonstatutory double patenting as being unpatentable over Claims 1-10 of [the '317 Patent]." (Doc. 79-30 at 4). USPTO

[3] The '105 application matured into the '317 Patent.

found that "[a]lthough the claims at issue are not identical, they are not patentably distinct from each other because the pending claims are directed to the same subject matter in a narrower form of the patented invention." (*Id.*). The following year, the USPTO rejected claims 4 to 13 of the '113 Application under § 101 "as being directed to a non-statutory subject matter because the claims as a whole, considering all the claim elements both individually and in combination, do not amount to significant more than an abstract idea. The USPTO explained that

> The claims are directed to the abstract idea of (i) a fundamental economic practice of providing awards in a game and (ii) an idea of itself for display. The additional elements or combination of elements in the claims other than the abstract idea per se amount to no more than: (i) mere instructions to implement the idea on a computer, and/or (ii) recitation of generic computer structure that serves to perform generic computer functions that are well-understood, routine, and conventional activities previously known to the pertinent industry. Viewed as a whole, these additional claim elements do not provide meaningful limitations to transform the abstract idea into a patent eligible application of the abstract idea such that the claims amount to significant more than the abstract idea itself.

(Doc. 79-31 at 4). Thereby, USPTO indirectly found the subject matter of claims 1-10 of the '317 Patent to be directed toward an abstract idea.

For its part, Epic Tech argues that the prosecution history for any subsequent, abandoned patent application is irrelevant to decide on the validity of the '317 Patent. (Doc. 84 at 21). But Epic Tech does not dispute the substance of

the USPTO's decision. And while it may be true that no court has found that "the prosecution history of a later patent [can] reach back and limit a claim using the same element in an earlier related patent" in the prosecution history estoppel context, the Court may still find persuasive value in the prosecution history of a later patent.

## II. Epic Tech's Summary Judgment Motion

Epic Tech also moved for summary judgment on its infringement claim. (Doc. 104). Epic Tech argues that Pen-Tech's Derby Dash software "literally infringes the asserted claims of the '317 Patent." (*Id.* at 17). Because the Court has determined that the '317 Patent is invalid as a matter of law, Epic Tech's infringement argument fails. *See Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644 (2015) ("To say that an invalid patent cannot be infringed, or that someone cannot be induced to infringe an invalid patent, is in one sense a simple truth, both as a matter of logic and semantics.").

## Conclusion

For the reasons above, Pen-Tech's Motion for Summary Judgment (Doc. 79) is **GRANTED**. The Clerk is **DIRECTED** to enter judgment declaring that the Claims 1, 2, 4, 5, 7–10, and 18 of U.S. Patent No. 8,545,317 are invalid under 18 U.S.C. § 101 for claiming an ineligible subject matter. Pen-Tech's Motion for Leave to File two Sur-Replies and a Declaration (Doc. 118) is **DENIED** as **MOOT**. Thus,

Pen-Tech's Motion for Leave to File Matters Under Seal (Doc. 119) is also **DENIED**. Epic Tech's Motion for Summary Judgment (Doc. 104) is **DENIED**.

**IT IS FURTHER ORDERED** that the Court retains jurisdiction post-judgment to decide Pen-Tech's Motions for Sanctions and the related motions (Docs. 120, 121, 123, & 131).[4] The Clerk is **DIRECTED** to close the case but to leave those motions pending.

**SO ORDERED** this 23rd day of September, 2024.

Victoria Marie Calvert
United States District Judge

---

[4] *See Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1265 (11th Cir. 2021) ("[T]he district court nevertheless retained jurisdiction to decide 'collateral issues'—'independent proceeding[s] supplemental to the original proceeding and not request[s] for a modification of the original decree.'"") (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990)).